FILED
15-0131
2/17/2015 1:27:24 PM
tex-4174474
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

NO. _____

IN THE

SUPREME COURT OF TEXAS

AUSTIN, TEXAS

FOREX CAPITAL MARKETS, LLC,

*Petitioner*,

v.

KELLY M. CRAWFORD, RECEIVER,

*Respondent*.

## PETITION FOR REVIEW

OF COUNSEL:
(*Application for admission
pro hac vice forthcoming*)

Lloyd A. Kadish
Illinois Bar No. 01378767
LLOYD KADISH & ASSOCIATES, LTD.
345 North Canal Street, Suite 901
Chicago, Illinois 60606
Telephone:  (312) 559-9181
Facsimile:   (312) 264-0470
lkadish@aol.com

Christopher H. Rentzel
Texas Bar No. 16785500
Kevin T. Schutte
Texas Bar No. 24033050
BRACEWELL & GIULIANI LLP
1445 Ross Avenue, Suite 3800
Dallas, Texas  75202
Telephone:  (214) 468-3800
Facsimile:   (800) 404-3970
christopher.rentzel@bgllp.com

Yvonne Y. Ho
Texas Bar No. 45055673
BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:  (713) 223-2300
Facsimile:   (800) 404-3970

ATTORNEYS FOR PETITIONER FOREX CAPITAL MARKETS, LLC

## IDENTITIES OF PARTIES AND COUNSEL

*Petitioner*:

Forex Capital Markets, LLC

*Counsel for Petitioner*:

Christopher H. Rentzel
Kevin T. Schutte
BRACEWELL & GIULIANI LLP
1445 Ross Avenue, Suite 3800
Dallas, Texas  75202-2711
Telephone:  (214) 468-3800
Facsimile:  (800) 404-3970

Yvonne Y. Ho
BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:  (713) 223-2300
Facsimile:  (800) 404-3970

Lloyd A. Kadish
Of counsel (application for admission
*pro hac vice* forthcoming)
LLOYD KADISH & ASSOCIATES, LTD.
345 North Canal Street, Suite 901
Chicago, Illinois 60606
Telephone:  (312) 559-9181
Facsimile:  (312) 264-0470

*Respondent*:

Kelly Crawford, Receiver, as Assignee

*Counsel for Respondent*:

Charlene C. Koonce
J. Mitchell Little
SCHEEF & STONE, L.L.P.
2601 Network Blvd., Suite 102
Frisco, Texas 75034
Telephone:  (214) 472-2100
Facsimile:  (214) 472-2150

# TABLE OF CONTENTS

*Page*

IDENTITIES OF PARTIES AND COUNSEL ......................................................... i

INDEX OF AUTHORITIES ............................................................................... iv

STATEMENT OF THE CASE ............................................................................ vii

STATEMENT OF JURISDICTION ................................................................... viii

ISSUE PRESENTED ..........................................................................................x

INTRODUCTION .............................................................................................1

STATEMENT OF FACTS .................................................................................2

    A.    The Investors authorized Revelation to engage a broker on their behalf. ..................................................................................................2

    B.    Revelation and its successors agreed to arbitrate disputes with FXCM. .....................................................................................................2

    C.    As Revelation's representative and successor, the Receiver sued FXCM, asserting claims assigned by Revelation's Investors that had become property of his estate. .....................................................4

    D.    The trial court and the court of appeals refused to enforce the arbitration clause against the Receiver. .............................................5

SUMMARY OF THE ARGUMENT ...................................................................6

ARGUMENT .....................................................................................................7

I.    Whether The Receiver Is Bound To Arbitrate Presents A Question Of Law That This Court Reviews De Novo. ...................................................7

II.    The Court Of Appeals Erred By Refusing To Enforce The Arbitration Clause. ........................................................................................................8

    A.    Legal constraints on the Receiver's authority bind him to the arbitration clause, regardless of whether he acquired these claims by assignment. ...................................................................................9

B.    The Receiver's obligation to arbitrate these claims predates the assignments and is thus binding on the Receiver ................................ 14

PRAYER ................................................................................................... 17

CERTIFICATE OF SERVICE ................................................................. 19

CERTIFICATE OF COMPLIANCE ........................................................ 20

APPENDIX ............................................................................................... 21

# INDEX OF AUTHORITIES

*Page(s)*

*Cases*

Akin Gump, Strauss, Hauer & Feld, L.L.P. v.
   E-Court, Inc., No. 03-02-00714-CV,
   2003 WL 21025030 (Tex. App.—Austin May 8, 2003, no pet.) ................. viii, 9

Cotten v. Republic Nat'l Bank,
   395 S.W.2d 930 (Tex. App.—Dallas 1965, writ ref'd n.r.e.).................... viii, 10

In re D. Wilson Constr. Co.,
   196 S.W.3d 774 (Tex. 2006) (orig. proceeding) ...................................................7

Finova Capital Corp. v. Lawrence,
   No. 399CV2552-M, 2000 WL 1808276
   (N.D. Tex. Dec. 8, 2000) ...............................................................................10

Forest Oil Corp. v. McAllen,
   268 S.W.3d 51 (Tex. 2008)................................................................................7

Forex Capital Mkts., LLC v. Crawford,
   No. 05-14-00341-CV, 2014 WL 7498051
   (Tex. App.—Dallas Dec. 31, 2014)................................................................ vii

Freedom Commc'ns, Inc. v. Coronado,
   372 S.W.3d 621 (Tex. 2012) (per curiam) ........................................................12

Global Drywall Sys., Inc. v. Coronado Paint Co.,
   104 S.W.3d 538 (Tex. 2003) ............................................................................14

Hayes and Co. v. Merrill Lynch,
   Pierce, Fenner & Smith, Inc.,
   885 F.2d 1149 (3d Cir. 1989) ......................................................................12, 13

J.M. Davidson, Inc. v. Webster,
   128 S.W.3d 223 (Tex. 2003) ..............................................................................8

Janvey v. Democratic Senatorial Campaign Comm., Inc.,
   712 F.3d 185 (5th Cir. 2013) ........................................................................10, 16

*In re L&L Kempwood Assocs., L.P.*,
    9 S.W.3d 125 (Tex. 1999) (per curiam)..................................................................7

*Logan v. JKV Real Estate Servs. (In re Bogdan)*,
    414 F.3d 507 (4th Cir. 2005) ............................................................10, 11, 16

*MCI Sales & Serv., Inc. v. Hinton*,
    329 S.W.3d 475 (Tex. 2010) ...........................................................................12

*Murphy Oil USA, Inc. v. Wood*,
    438 F.3d 1008 (10th Cir. 2006) .......................................................................15

*Oakes v. Lake*,
    290 U.S. 59 (1933)...........................................................................................16

*Petrofac, Inc. v. DynMcDermott Petroleum*
    *Operations Co.*, 687 F.3d 671 (5th Cir. 2012) .................................................8

*Prudential Secs., Inc. v. Marshall*,
    909 S.W.2d 896 (Tex. 1995) .............................................................................7

*Reneker v. Offill*,
    3:08-CV-1394-D, 2012 WL 2158733
    (N.D. Tex. June 14, 2012) .........................................................................10, 12

*Scholes v. Lehmann*,
    56 F.3d 750 (7th Cir. 1995) .............................................................................10

*Scholes v. Stone, McGuire & Benjamin*,
    821 F. Supp. 533 (N.D. Ill. 1993).....................................................................10

*Seagull Energy E&P, Inc. v. Eland Energy, Inc.*,
    207 S.W.3d 342 (Tex. 2006) ...........................................................................14

*Secs. & Exch. Comm'n v. White*
    Civil Action No. 4:13-cv-383 (E.D. Tex. July 9, 2013)................................4, 12

*State v. Hogg*,
    535 A.2d 923 (Md. 1988), *abrogated on other grounds*,
    *Dawkins v. Baltimore City Police Dep't*,
    827 A.2d 115 (Md. 2003) .................................................................................15

*United States Commodity Futures
  Trading Comm'n v. RFF GP, LLC*,
  Civil Action No. 4:13-cv-382 (E.D. Tex. July 9, 2013)................................4, 12

*United States Small Bus. Admin. v. Coqui Capital
  Mgmt., LLC*, No. 08 Civ. 0978,
  2008 WL 4735234 (S.D.N.Y. Oct. 27, 2008)................................................12, 16

**Statutes**

9 U.S.C. § 1, *et seq.*.......................................................................................7

TEX. GOV'T CODE ANN. 22.225(c)...................................................................ix

TEX. GOV'T CODE ANN. § 22.001(a)(2) ...........................................................ix

**Rules**

TEX. R. EVID. 201(d) ......................................................................................12

**Treatises**

COLLIER ON BANKRUPTCY ¶ 323.02[4] ...........................................................13

CORBIN ON CONTRACTS § 51.2 (2014) .............................................................15

**Other Authorities**

Details for Forex Capital Markets LLC (NFA ID: 0308179),
  National Futures Association, *available at*
  http://www.nfa.futures.org/
  basicnet/Details.aspx?entityid=uy8vi7mVysc%3d&rn =Y.................................2

RESTATEMENT (SECOND) OF CONTRACTS § 336(4) (1981) ..........................14, 15, 16

# STATEMENT OF THE CASE

*Nature of the Case:* This dispute pertains to the enforcement of an arbitration agreement against the receiver for an investment partnership. Respondent Kelly Crawford, a court-appointed receiver ("Receiver") for Revelation Forex Fund, LP ("Revelation"), sued Petitioner Forex Capital Markets, LLC ("FXCM"), a futures commission merchant, in a Texas state district court. (CR.11, 301-02). The Receiver's claims were allegedly obtained by assignment from third-party investors who were limited partners of Revelation. (CR.13). By agreement, Revelation and its "estate, . . . administrators, legal representatives, [and] successors" must arbitrate all disputes against FXCM. (App. A at 4 ¶ 23; CR.825 ¶ 23; CR.826-27). That same agreement also requires all judicial proceedings in connection with these transactions to be held in New York. (CR.826 ¶ 30).

*Trial Court:* Hon. Jill Willis, 429th Judicial District Court of Collin County, Texas

*Trial Court's Action:* FXCM filed a Motion to Compel Arbitration, pursuant to an enforceable arbitration agreement. (CR.161-267). In the alternative, FXCM filed a motion to dismiss based on a mandatory forum selection clause in the same agreement. (CR.161-267). The trial court denied both motions on March 7, 2014. (App. B; CR.1070-71).

*Court of Appeals:* Fifth District of Texas at Dallas; Justices O'Neill, Lang-Miers, and Brown

*Court of Appeals Disposition:* On March 18, 2014, FXCM filed a notice of interlocutory appeal from the denial of its motion to compel arbitration. (CR.1102-04). On April 16, 2014, FXCM filed a petition for writ of mandamus from the denial of its motion to dismiss based on the forum-selection clause. The court of appeals consolidated both proceedings. On December 31, 2014, the court of appeals issued an opinion denying mandamus relief and affirming the order denying FXCM's motion to compel arbitration. *Forex Capital Mkts., LLC v. Crawford*, No. 05-14-00341-CV, 2014 WL 7498051 (Tex. App.—Dallas Dec. 31, 2014); (App. C, slip op).

## STATEMENT OF JURISDICTION

This petition for review presents the same legal question involving the same contractual agreement for which Petitioner Forex Capital Markets, LLC ("FXCM") has also sought mandamus relief in this Court. *See In re Forex Capital Markets, LLC*, No. 15-0128 (Tex. Feb. 16, 2015). Whereas this petition requests that the Court enforce an arbitration clause in the agreement, FXCM's petition for writ of mandamus requests enforcement of a forum selection clause in that agreement. Yet in both proceedings, the issue is whether an equity receiver can escape the contractual obligations of the receivership entity he represents, merely because he purports to be asserting claims assigned to him by third parties.

By allowing Respondent Kelly Crawford (the "Receiver") to avoid his contractual obligation to arbitrate, the court of appeals created a conflict with decisions by Texas courts recognizing that receivers cannot bring claims unless they are property of the receivership estate. *See Akin Gump, Strauss, Hauer & Feld, L.L.P. v. E-Court, Inc.*, No. 03-02-00714-CV, 2003 WL 21025030, at *5 (Tex. App.—Austin May 8, 2003, no pet.) ("[A] receiver does not have an unfettered right to represent creditors and shareholders of a corporation. A receiver may represent creditors and shareholders only to the extent that the cause of action seeks to preserve or recover corporate assets."); *Cotten v. Republic Nat'l Bank*, 395 S.W.2d 930, 931 (Tex. App.—Dallas 1965, writ ref'd n.r.e.) (same

principle). If the Receiver can only bring assigned claims that are property of the receivership estate, then he is subject to the contractual obligations of the receivership entity he represents when asserting these claims—here, the arbitration (and forum selection) clause. This conflict warrants review. *See* TEX. GOV'T CODE ANN. §§ 22.001(a)(2); 22.225(c).

Even if the Court declines to find a direct conflict with prior Texas opinions, the Court should exercise its equitable power to hold this petition for review until FXCM's related petition for writ of mandamus has been decided. Because the reasons for enforcing the arbitration clause are identical to those raised in FXCM's mandamus petition, a hold is warranted to avoid the potential for creating a conflict in this case regarding the enforceability of interrelated provisions of the same agreement. Under these unique circumstances, the petition for review should, at minimum, be held until FXCM's petition for writ of mandamus is resolved.

## ISSUE PRESENTED

Whether an equity receiver is required to arbitrate claims procured by assignment from third parties, when:

a. the assignments made the claims property of the receiver's estate and the estate is bound to the arbitration clause; and

b. the receiver's obligation to arbitrate this dispute accrued before he received the assignments.

## INTRODUCTION

The lower courts incorrectly allowed an equity receiver to circumvent his contractual obligation to arbitrate these claims, merely because he purports to be asserting claims assigned by third parties. It does not matter that the receiver purports to bring these claims as assignee because the claims are now the property of his estate. The receiver is bound to the arbitration clause because he "stands in the shoes" of the receivership entity which is indisputably bound by it. The receiver is also bound to the clause under the plain language of the contract.

Established receivership law dictates that a receiver only has the standing to bring assigned claims if they belong to his estate. Because the claims must now belong to his estate, the receiver is subject to the contractual obligations of that estate—including the arbitration clause. Moreover, the contract explicitly provides that the receiver, as the legal representative or successor of the receivership entity, is bound to the arbitration clause regardless of how the estate obtained these claims. This Court should prevent the Receiver from using an "assignment" strategy to evade his contractual obligations, reverse the court of appeals' judgment, and enforce the arbitration clause.

## STATEMENT OF FACTS

**A.    *The Investors authorized Revelation to engage a broker on their behalf.***

Revelation Forex Fund, L.P. ("Revelation") is an investment fund that solicited investors ("Investors") to purchase limited partnership interests. (CR.841-74). Revelation's general partner was RFF GP, LLC, which, in turn, was solely owned by Kevin G. White ("White"). (CR.835-37, 841).

Before making their investments, the Investors expressly authorized RFF to make decisions and conduct business on Revelation's behalf, (CR.854; CR.891-92 § 10.01; CR.900 ¶ 18), and allowed Revelation to invest on their behalf in accounts maintained in Revelation's name. (CR.880 § 2.01(b); CR.900 ¶ 18(b)). Revelation also advised the Investors it intended to trade foreign currencies ("Forex"), and that RFF would have exclusive control over that trading. (CR.845, 852-53).

**B.    *Revelation and its successors agreed to arbitrate disputes with FXCM.***

Acting on Revelation's behalf, White opened an account with Forex Capital Markets, LLC ("FXCM"), a futures commission merchant that provides online platforms for Forex trading worldwide. (*See* CR.822). FXCM is registered with the National Futures Association and is headquartered in New York City. (CR.826 ¶ 28); *see also* Details for Forex Capital Markets LLC (NFA ID: 0308179), National Futures Association, *available at* http://www.nfa.futures.org/ basicnet/Details.aspx?entityid=uy8vi7mVysc%3d&rn =Y.

To open the account, White executed a Client Agreement in Revelation's name (the "Client Agreement" or "Agreement"). (CR.821-38). Pursuant to that Agreement, Revelation agreed to arbitrate all disputes in connection with its transactions through FXCM:

> [Revelation] agrees and, by opening one or more accounts for [Revelation], FXCM also agrees, that <u>any and all disputes, controversies, or claims arising out of this Client Agreement, or the relationships or activities contemplated thereby</u>, including whether or not any such dispute, controversy, or claim is arbitrable, <u>shall be resolved by an Arbitration Panel selected by the National Futures Association ("NFA"), pursuant to the NFA's Code of Arbitration</u>. The award of the NFA Arbitrators, or of the majority of them, shall be final, and judgment upon the award may be entered in any court of competent jurisdiction.

(App. A at 6; CR.827 (emphasis added)). Revelation also agreed that its estate, legal representatives, and successors are to be bound to the terms of the Client Agreement, including the arbitration clause:

> This Client Agreement including <u>all authorizations</u>, shall inure to the benefit of FXCM and its successors and assigns, whether by merger, consolidation or otherwise, and <u>shall be binding upon Trader and/or the estate, executor, trustees, administrators, legal representatives, successors and assigns of [Revelation]</u> . . . .

(App. A at 4, ¶ 23; CR.825 ¶ 23 (emphasis added)). The Client Agreement also includes a forum selection clause specifying that any dispute in connection with the trading transactions must be resolved in New York. (App. A at 5, ¶ 30; CR.826

-3-

¶ 30). Revelation, through White, "acknowledge[d] [its] agreement [with] and understanding of" these provisions. (CR.834).

### C. As Revelation's representative and successor, the Receiver sued FXCM, asserting claims assigned by Revelation's Investors that had become property of his estate.

As a result of two lawsuits,[1] the Receiver was appointed for White, RFF, KGM Capital Management, LLC, and Revelation. (CR.12, 48, 53, 66). The Receiver was given the authority to pursue claims and bring actions in connection with the property of his estate. (CR.45-64; CR.65-81). The Receiver then devised a plan to obtain assignments from the Investors in order to pursue certain causes of action in Texas state court. (2RR.21:5-8; CR.452-559).

The Receiver filed this suit against FXCM, (CR.11), purporting to act "solely" as assignee of all Investors in Revelation. (CR.301-02). The Receiver alleges that Revelation operated as a fraud, using FXCM as its broker and FXCM's employee, Brian Hinman, as its trader. (CR.14). According to the Receiver, FXCM did not properly supervise Hinman in his efforts to solicit funds and trade for Revelation. (CR.24-25, 37-38). The Receiver claims that FXCM is liable for the loss of the funds that the Investors deposited into Revelation. (CR.35-38, 42).

---

[1] *Secs. & Exch. Comm'n v. White* ("*SEC Action*"), Civil Action No. 4:13-cv-383 (E.D. Tex.) (filed July 9, 2013); *United States Commodity Futures Trading Comm'n v. RFF GP, LLC* ("*CFTC Action*"), Civil Action No. 4:13-cv-382 (E.D. Tex.) (filed July 9, 2013).

**D.** ***The trial court and the court of appeals refused to enforce the arbitration clause against the Receiver.***

FXCM filed a timely Motion to Compel Arbitration under the Federal Arbitration Act (the "FAA"). (CR.168-71). In the alternative, FXCM filed a motion to dismiss the Receiver's suit based on the forum selection clause in the same Client Agreement. (CR.165-68). The trial court denied both motions on March 7, 2014. (CR.1070-71). FXCM filed an interlocutory appeal from the denial of its motion to compel arbitration, and filed a petition for writ of mandamus from the denial of its motion to dismiss. The court of appeals granted FXCM's motion to consolidate these two proceedings.

On December 31, 2014, the court of appeals affirmed the order denying FXCM's motion to compel arbitration. (App. C, slip op. at 1, 7). The court held that the Receiver is not bound to arbitrate the assigned claims because the Investors were not parties to the Client Agreement containing the arbitration clause. (App. C, slip op. at 4-5, 7). While the court agreed that receivers generally are bound to the contractual obligations of their receivership entities, it found that this Receiver could avoid such obligations simply by asserting claims assigned to him by the Investors. (App. C, slip op. at 5-6). Applying the same reasoning, the court of appeals also denied mandamus relief from the order refusing to enforce the forum selection clause. (*See* App. C, slip op. 6-7).

FXCM filed this petition for review based on the arbitration clause in the Client Agreement. Relatedly, FXCM also filed a petition for writ of mandamus based on the forum selection clause in the same Agreement. *See In re Forex Capital Markets, LLC*, No. 15-0128 (Tex. Feb. 16, 2015).

## SUMMARY OF THE ARGUMENT

There is no dispute that the arbitration clause covers the subject matter of the Receiver's claims, or that the clause is otherwise valid and enforceable. The only issue is whether the Receiver is bound to the arbitration clause when he asserts claims assigned to him by third parties. The answer to that question is "yes."

First, legal constraints on the Receiver's authority dictate that the arbitration clause applies to the Receiver's claims. Under settled law, a receiver can only bring assigned claims that belong to, and are property of, his receivership estate—here, the estate of Revelation, which executed the Client Agreement. Because the claims are now part of the Receiver's estate, he is subject to all the same obligations that applied to Revelation, including the arbitration clause. As the case law makes clear, the Receiver "stands in the shoes" of his estate.

Second, the arbitration clause applies to the Receiver under general principles of contract law. An assignee, like the Receiver, remains subject to any defenses that FXCM could have asserted against him before the assignments occurred. Here, both the Client Agreement and settled principles of receivership

law bound the Receiver to the arbitration clause when he was appointed Revelation's receiver—before he solicited the assignments of the Investors' claims. Because the obligation stemming from the arbitration clause pre-dates the assignments, the Receiver is bound to the clause as a matter of law. This Court should reverse and direct that all claims be dismissed.

## ARGUMENT

### I. Whether The Receiver Is Bound To Arbitrate Presents A Question Of Law That This Court Reviews De Novo.

Because this Agreement involves interstate commerce, it is governed by the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. § 1, *et seq.*; *In re L&L Kempwood Assocs., L.P.*, 9 S.W.3d 125, 127 (Tex. 1999) (per curiam). The FAA embodies a strong presumption in favor of arbitration, such that any doubts regarding arbitrability must be resolved in favor of arbitration. *Prudential Secs., Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995).

To compel arbitration, a party must satisfy two requirements: (a) the existence of a valid agreement to arbitrate; and (b) that the claims fall within the scope of the agreement. *See In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006) (orig. proceeding). When, as here, the facts relating to the existence of a valid arbitration agreement are undisputed, this Court's review is de novo. *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 55 n.9 (Tex. 2008) ("The trial court's determination of the arbitration agreement's validity is a legal question subject to

de novo review.") (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003)).

The second requirement, whether the claims are covered by an arbitration agreement, is undisputed, and, in any event, is not a determination for the Court. Under the Agreement, disputes regarding arbitrability are for the arbitrators to resolve. (CR.827); *see Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 674-75 (5th Cir. 2012).

## II. <u>The Court Of Appeals Erred By Refusing To Enforce The Arbitration Clause.</u>

In upholding the denial of FXCM's motion to compel arbitration, the court of appeals failed to correctly apply the legal principles that constrain the Receiver's authority. By accepting the position as a receiver, the only "shoes" the Receiver may now wear are those of his estate. He cannot bring claims in any other capacity. And because the estate, through Revelation, is bound to the arbitration clause, so is the Receiver. Moreover, because the Receiver's obligations under the arbitration clause arose before he ever accepted the assignments, he is also subject to the clause under applicable principles of contract law. This Court should reverse.

**A.** ***Legal constraints on the Receiver's authority bind him to the arbitration clause, regardless of whether he acquired these claims by assignment.***

Because there is no dispute that the Receiver's claims fall within the scope of the arbitration clause, the sole issue is whether the Receiver is bound to it. On that issue, the court of appeals found that the source of the claims was dispositive. According to the court of appeals, the only defenses that may apply to the Receiver's claims are those which FXCM had against the Investors, as assignors. (App. C, slip. op. at 4-6). But that analysis ignores receivership law, which forbids the Receiver from asserting claims assigned by third parties unless they first have become property of his estate. Once those claims became property of the Receiver's estate, it did not matter how the estate acquired them; Revelation's obligation to arbitrate this suit applied equally to the Receiver.

The Receiver can only represent his receivership estate; he lacks standing to bring claims on behalf of third parties like the Investors. Texas courts have acknowledged this principle, consistent with a long line of authority from the federal courts. *See Akin Gump, Strauss, Hauer & Feld, L.L.P. v. E-Court, Inc.*, No. 03-02-00714-CV, 2003 WL 21025030, at *5 (Tex. App.—Austin May 8, 2003, no pet.) ("[A] receiver does not have an unfettered right to represent creditors and shareholders of a corporation. A receiver may represent creditors and shareholders only to the extent that the cause of action seeks to preserve or recover

corporate assets."); *see also Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 190 (5th Cir. 2013) ("[A] federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors . . . .").[2]

Thus, the only way a receiver can bring third-party claims, such as those of the Investors, is if those claims have become the property of his estate. *See Cotten v. Republic Nat'l Bank*, 395 S.W.2d 930, 931 (Tex. App.—Dallas 1965, writ ref'd n.r.e.) (a receiver may only bring third-party claims "to the extent that his cause of action seeks to preserve or recover the assets" of the entity in receivership). This is also true in the analogous context of bankruptcy, where courts permit trustees to assert claims assigned by third parties only if those assignors have effectively "abandon[ed] their claims," caused the assigned claims to become "property of the estate," and "allow[ed] the trustee to seek recovery . . . on behalf of the estate." *Logan v. JKV Real Estate Servs. (In re Bogdan)*, 414 F.3d 507, 512-13 (4th Cir. 2005); *see also Finova Capital Corp. v. Lawrence*, No. 399CV2552-M, 2000 WL 1808276, at *2 (N.D. Tex. Dec. 8, 2000) (same principle). In this case, the

---

[2] *See also, e.g.*, *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995) ("Like a trustee in bankruptcy . . . an equity receiver may sue only to redress injuries to the entity in receivership . . . ."); *Reneker v. Offill*, 3:08-CV-1394-D, 2012 WL 2158733, at *5 (N.D. Tex. June 14, 2012) ("'It is a well-known legal principle that a receiver can bring only those claims belonging to the entity it represents and cannot bring claims on behalf of third parties.'") (quoting *Scholes v. Stone, McGuire & Benjamin*, 821 F. Supp. 533, 535 (N.D. Ill. 1993)).

assignments must—and did—make the Investors' claims property of the Receiver's estate. As a result, the Receiver's estate has become the real party in interest, rather than the third-party Investors who assigned the claims. *See In re Bogdan*, 414 F.3d at 513.

While the court of appeals acknowledged these limitations on the Receiver's authority, it failed to appreciate their ramifications with respect to the Receiver's obligations to arbitrate these claims. (*See, e.g.*, App. C, slip op. at 5-6 & n.5). Thus, the court of appeals erred in finding that the Receiver stood in the shoes of the Investors. *Id.* at 4, 6.

The Receiver cannot elect to assert standing based solely on the "investors' unconditional assignments" and ignore "his capacity as a receiver," as the court of appeals believed. (App. C, slip op. at 6). These claims against FXCM now belong to the Receiver's estate, and he is prosecuting them as its representative and as the successor to Revelation. Any recovery from FXCM will become the property of his estate and will be distributed in accordance with the estate's guidelines, not merely to the Investors. (CR.454-55; 2RR.28). Thus, by any measure, Mr. Crawford is functioning as an equity receiver, not solely as an assignee, in prosecuting these claims.

The court of appeals erred when it found that ownership of these claims was "not pertinent to [its] resolution of this appeal." (App. C, slip op. at 5 n.4). To the

contrary, the estate's ownership of these claims is crucial; otherwise, the Receiver would not have standing to bring them in the first instance. *See Reneker v. Offill*, 3:08-CV-1394-D, 2012 WL 2158733, at *4-5 (N.D. Tex. June 14, 2012) (to have standing, a receiver must allege "injury in fact" arising from claims belonging to his estate).[3] Had it fully considered these facts, the court of appeals would have concluded that the Receiver stood in the shoes of his estate, not in those of the Investors. As a result, the Receiver is bound to Revelation's Client Agreement and the arbitration clause in it. *See United States Small Bus. Admin. v. Coqui Capital Mgmt., LLC*, No. 08 Civ. 0978, 2008 WL 4735234, at *2 (S.D.N.Y. Oct. 27, 2008).

The court of appeals also failed to apply the relevant rule in *Hayes and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989). (App. C, slip op. at 5). In *Hays*, the court required the bankruptcy trustee to

---

[3] The court of appeals also erred in concluding that the Receiver "does not concede the claims themselves are receivership property." (App. C, slip op. at 5 n.4). In fact, the Receiver admitted that these claims belong to his estate. (2RR.19-20 (admitting these are "claims of the receivership estate" that the Receiver has standing to assert)); *see also SEC Action*, Civil Action No. 4:13-cv-383, Dkt. 74 at 6 (E.D. Tex. Jan. 6, 2014); *CFTC Action*, Civil Action No. 4:13-cv-382, Dkt. 70 at 5 (E.D. Tex. Jan. 6, 2014) (characterizing these as "claims held by the receivership estate") (capitalization removed). This Court should take judicial notice of these pleadings on file in the *SEC* and *CFTC Actions*, which are included in Tabs D and E of the Appendix, pursuant to Texas Rule of Evidence 201(d). *See Freedom Commc'ns, Inc. v. Coronado*, 372 S.W.3d 621, 623 (Tex. 2012) (per curiam) ("Under [Rule 201(d)], a court will take judicial notice of another court's records if a party provides proof of the records.") (citing *MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 497 n.21 (Tex. 2010)).

arbitrate all claims that, like those at issue here, were property of his estate. 885 F.2d at 1154. The *Hays* court found that, in prosecuting such claims, the trustee was "successor to the debtor's interest" and thus "'subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor.'" *Id.* (quoting COLLIER ON BANKRUPTCY ¶ 323.02[4]). The only claims not subject to arbitration were certain "avoidance" claims that belong directly to the trustee, rather than the debtor, and that the Bankruptcy Code confers express standing for the trustee to bring. *Id.*

Under *Hays*, Revelation is subject to the arbitration because that clause could have been asserted by FXCM "had the action been instituted by" Revelation. *Id.* And unlike the avoidance claims addressed in *Hays*, the Receiver does not acquire standing under the Bankruptcy Code, but rather, is asserting these claims while acting as Revelation's successor. As a result, the Receiver is subject to the same arbitration clause that applies to Revelation.

In short, Revelation expressly agreed that its "estate," "legal representatives," and "successors" must arbitrate all suits in connection with its transactions through FXCM. (CR.825 ¶ 23). Once these assigned claims became the property of the Receiver's estate, all defenses against the Receiver apply when he prosecutes them on the estate's behalf. Because receivership principles bind the

-13-

Receiver to the arbitration clause, the court of appeals erred by refusing to direct the dismissal of this case.

**B.** ***The Receiver's obligation to arbitrate these claims predates the assignments and is thus binding on the Receiver.***

The court of appeals' exclusive focus on the origin of the assigned claims is also misplaced because the Receiver was *already bound* to the arbitration clause before the assignments occurred. Because the Receiver's obligation to arbitrate predates the assignments, FXCM is entitled to enforce it against the Receiver.

Basic contract principles dictate that the Receiver, as an assignee, is subject to any defenses that FXCM could have asserted against him before the assignments were made. For these principles, this Court need only look to the Restatement (Second) of Contracts, as it has done in many cases. *See, e.g.*, *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 347 (Tex. 2006) (adopting Restatement's approach regarding the effect of an assignment); *Global Drywall Sys., Inc. v. Coronado Paint Co.*, 104 S.W.3d 538, 538 n.2 (Tex. 2003) (citing Restatement's approach regarding limitations on the right to assign claims).

The Restatement makes clear that assignees are subject to any defenses that the defendant had against them before the assignments occurred:

> An assignee's right against the obligor is subject to any defense or claim arising from his conduct or to which he was subject as a party or a prior assignee because he had notice.

RESTATEMENT (SECOND) OF CONTRACTS § 336(4) (1981); *cf.* CORBIN ON CONTRACTS § 51.2 (2014) ("A counterclaim, set-off, or recoupment, arising out of the same transaction as that by which the claim of the assignee was itself created, is usable [by the defendant] against the assignee in precisely the same cases that it would be so usable if it were operative as a complete defense."). Such preexisting defenses are unaffected by the assignments. *Cf. Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1016-17 & n.7 (10th Cir. 2006); *State v. Hogg*, 535 A.2d 923, 933-35 (Md. 1988), *abrogated on other grounds*, *Dawkins v. Baltimore City Police Dep't*, 827 A.2d 115 (Md. 2003).

Under these Restatement principles, the Receiver's rights against FXCM are subject to the arbitration clause for two reasons. First, the Client Agreement obligated the Receiver to arbitrate *all disputes* against FXCM, well before the claims were assigned to him:

> This Client Agreement . . . shall be <u>binding upon [Revelation] and/or the estate, executor, trustees, administrators, legal representatives, successors</u> and assigns of [Revelation].

(CR.825 ¶ 23 (emphasis added)). There is no question that the Receiver falls within the scope of this clause as Revelation's "legal representative" or "successor" acting on behalf of Revelation's "estate." Additionally, there is no dispute that the subject matter of this suit is covered by the arbitration clause. Since the Client Agreement contains no exception for claims acquired by

-15-

assignment, those claims were subject to the Client Agreement once they became part of the Receiver's estate. As a result, the Receiver's rights, even as an assignee, are subject to FXCM's arbitration-clause defense under the Client Agreement that Revelation executed well before the Receiver was assigned these claims. *See* RESTATEMENT (SECOND) OF CONTRACTS § 336(4).

Second, in addition to the Client Agreement's express language, the Receiver also was bound to the arbitration clause because of limitations on his capacity as receiver. As soon as he accepted that position, the Receiver could only prosecute claims on behalf of his estate, whether derived from Revelation or by assignment. *See Janvey*, 712 F.3d at 190; *In re Bogdan*, 414 F.3d at 512-13; *see also supra* 9-14. Thus, the Receiver immediately succeeded to defenses that apply to his estate, such as the arbitration clause.[4] *See Coqui Capital Mgmt., LLC*, 2008 WL 4735234, at *2.

In short, under applicable contract and receivership principles, the Receiver is bound by the arbitration clause in the Revelation-FXCM Client Agreement.

---

[4] Nor is this principle inconsistent with *Oakes v. Lake*, 290 U.S. 59, 62-63 (1933), on which the court of appeals mistakenly relied. (App. C, slip op. at 6). In *Oakes*, the receiver acquired additional authority by the assignment of claims—just as the Receiver here has acquired standing to bring the Investors' claims. Nowhere does *Oakes* suggest that an assignment negates any pre-existing defense against the Receiver. Instead, the common-law contract principles discussed above make clear that preexisting defenses can be asserted against the Receiver, as assignee.

This Court should reverse the court of appeals' judgment and order that this case be dismissed.

## PRAYER

For these reasons, Petitioner Forex Capital Markets, LLC prays that this Court grant review, reverse the court of appeals' judgment, and order that this suit be dismissed, or alternatively, to hold this petition until the related petition for writ of mandamus on the enforceability of the forum selection clause is resolved.

Respectfully submitted,

BRACEWELL & GIULIANI LLP

By: */s/ Christopher H. Rentzel*
    Christopher H. Rentzel
    Texas Bar No. 16785500
    Chris.Rentzel@bgllp.com
    Kevin T. Schutte
    Texas Bar No. 24033050
    Kevin.Schutte@bgllp.com

1445 Ross Avenue, Suite 3800
Dallas, Texas 75202
Telephone: (214) 468-3800
Facsimile: (800) 404-3970

    Yvonne Y. Ho
    Texas Bar No. 45055673
    yvonne.ho@bgllp.com

711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone: (713) 223-2300
Facsimile: (800) 404-3970

OF COUNSEL:

LLOYD KADISH & ASSOCIATES, LTD.

Lloyd A. Kadish
Illinois Bar No. 01378767
LKadish@aol.com

345 North Canal Street, Suite 901
Chicago, Illinois 60606
Telephone:   (312) 559-9181
Facsimile:   (312) 264-0470

ATTORNEYS FOR PETITIONER
FOREX CAPITAL MARKETS, LLC

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this Petition for Review was served on the following counsel of record by the Electronic Filing Service provider on the 17th day of February, 2015, addressed as follows:

J. Mitchell Little
mitch.little@solidcounsel.com
Charlene C. Koonce
charlene.koonce@solidcounsel.com
SCHEEF & STONE, L.L.P.
2601 Network Blvd., Suite 102
Frisco, Texas 75034
*Counsel for the Receiver*

Robert Coleman
Robert.Coleman@WilsonElser.com
WILSON ELSER MOSKOWITZ EDELMAN & DICKET, LLP
Bank of America Plaza
901 Main Street, Suite 4800
Dallas, Texas 75202
*Counsel for Weaver & Tidwell, L.L.P.*

Scott Palmer
scott@scottpalmerlaw.com
SCOTT H. PALMER, P.C.
15455 North Dallas Parkway, Suite 540
Addison, Texas 75001
*Counsel for Brian Hinman*

*/s/ Yvonne Y. Ho*
Yvonne Y. Ho

## CERTIFICATE OF COMPLIANCE

This petition complies with the length limitations of TEX. R. APP. P. 9.4 because this petition consists of 3,974 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(l).

<em>/s/ Yvonne Y. Ho</em>

Yvonne Y. Ho

NO. _____

IN THE

SUPREME COURT OF TEXAS

AUSTIN, TEXAS

FOREX CAPITAL MARKETS, LLC,

*Petitioner*,

v.

KELLY M. CRAWFORD, RECEIVER,

*Respondent*.

**APPENDIX TO PETITION FOR REVIEW**

OF COUNSEL:
(*Application for admission
pro hac vice forthcoming*)

Lloyd A. Kadish
Illinois Bar No. 01378767
LLOYD KADISH & ASSOCIATES, LTD.
345 North Canal Street, Suite 901
Chicago, Illinois 60606
Telephone: (312) 559-9181
Facsimile: (312) 264-0470
lkadish@aol.com

Christopher H. Rentzel
Texas Bar No. 16785500
Kevin T. Schutte
Texas Bar No. 24033050
BRACEWELL & GIULIANI LLP
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202
Telephone: (214) 468-3800
Facsimile: (800) 404-3970
christopher.rentzel@bgllp.com

Yvonne Y. Ho
Texas Bar No. 45055673
BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone: (713) 223-2300
Facsimile: (800) 404-3970

ATTORNEYS FOR PETITIONER FOREX CAPITAL MARKETS, LLC

-21-

# **APPENDIX**

***Tab***

Client Agreement between Forex Capital Markets, LLC and
Revelation Forex Fund, L.P. (R.821-38) ...................................................A

Trial Court's Order denying Forex Capital Markets, LLC's Motion to
Dismiss for Improper Venue and Lack of Jurisdiction, and in the Alternative,
Motion to Compel Arbitration, signed on March 7, 2014 (R.1070-71) ...................B

Court of Appeal's Opinion and Judgment, issued on December 31, 2014 ..............C

Status Report,
   *Sec. & Exch. Comm'n v. White*,
   Civil Action No. 4:13-cv-0383, Dkt. 74 (E.D. Tex. Jan. 6, 2014) ......................D

Status Report,
   *United States Commodity Futures Trading Comm'n v. RFF GP, LLC*,
   Civil Action No. 4:13-cv-382, Dkt. 70 (E.D. Tex. Jan. 6, 2014) ........................E

#4799720.7

# Tab A



# CLIENT AGREEMENT

© FOREX CAPITAL MARKETS LLC

For Individual Accounts, please complete pages 7-8 & 11-13
For Corporate Accounts, please complete pages 7-8 & 11-15
For Limited Liability Company (LLC) Accounts, please complete pages 7-8, 11-13 & 16-17
For Partnership Accounts, please complete pages 7-8, 11-13 & 18-19
For Trust Accounts, please complete pages 7-8, 11-13 & 20
For ALL Managed Accounts, please additionally complete page 21
Along with a copy of identification & proof of address

And return to:

**Forex Capital Markets**
Financial Square
32 Old Slip, 10th Floor
New York, NY 10005
United States
Fax: (212) 897-7669

## FXCM RISK DISCLOSURE STATEMENT

This brief statement does not disclose all of the risks and other significant aspects of spot foreign currency trading ("Forex"). In light of the risks, you should undertake such transactions only if you ("Trader" or "Client") understand the nature of the trading into which you are about to engage and the extent of your exposure to risk. Trading in Forex is not suitable for many members of the public. You should carefully consider whether trading is appropriate for you in light of your experience, objectives, financial resources and other relevant circumstances.

**Spot Forex Trading**
**1. Effect of "Leverage" or "Gearing"**
Forex Transactions carry a high degree of risk. The amount of initial margin may be small relative to the value of the foreign currency so that transactions are 'leveraged' or 'geared'. A relatively small market movement may have a proportionately larger impact on the funds you have deposited or will have to deposit: this may work against you as well as for you. You may sustain a total loss of initial margin funds and any additional funds deposited with the firm to maintain your position. If the market moves against your position or margin levels are increased, you may be called upon to pay substantial additional funds on short notice to maintain your position. If you fail to comply with a request for additional funds within the time prescribed, FXCM in its sole discretion may liquidate any or all of your positions at a loss.

**2. Risk-reducing orders or strategies**
The placing of certain orders (e.g., "stop-loss" orders, where permitted under local law, or "stop-limit" orders), which are intended to limit losses to certain amounts, may not be effective because market conditions may make it impossible to execute such orders. Strategies using combinations of positions, such as "spread" and "straddle" positions, may be as risky as taking simple "long" or "short" positions.

**3. FXCM is not a dealer in Forex options.**

**4. Terms and conditions of Spot Forex Trading**
You should ask the firm with which you deal about the terms and conditions of the specific foreign currency which you are trading and associated obligations.

**5. Suspension or restriction of trading and pricing relationships**
Market conditions (e.g., liquidity) and/or the operation of the rules of certain markets (e.g., the suspension of trading in any foreign currency because of price limits or "circuit breakers") may increase the risk of loss by making it difficult or impossible to effect transactions or liquidate/offset positions. Further, normal pricing relationships between the underlying interest and the foreign currency may not exist. The absence of an underlying reference price may make it difficult to judge "fair" value.

**6. Deposited cash and property**
You should familiarize yourself with the protections accorded money or other property you deposit for domestic and foreign transactions, particularly in the event of a firm insolvency or bankruptcy. The extent to which you may recover your money or property may be governed by specific legislation or local rules. In some jurisdictions, property, which has been specifically identifiable as your own, will be pro-rated in the same manner as cash for purposes of distribution in the event of a shortfall.

**7. Commission and other charges**
Before you begin to trade, you should obtain a clear explanation of all commission, fees and other charges for which you will be liable. These charges will affect your net profit (if any) or increase your loss.

**8. Transactions in other jurisdictions**
Transactions on markets in other jurisdictions, including markets formally linked to a domestic market, may expose you to additional risk. Such markets may be subject to regulation, which may offer different or diminished investor protection. Before you trade you should enquire about any rules relevant to your particular transactions. Your local regulatory authority will be unable to compel the enforcement of the rules of regulatory authorities or markets in other jurisdictions where your transactions have been effected. You should ask the firm with which you deal for details about the types of redress available in both your home jurisdiction and other relevant jurisdictions before you start to trade.

**9. Currency risks**
The profit or loss in transactions in foreign currency (whether they are traded in your own or another jurisdiction) will be affected by fluctuations in currency rates where there is a need to convert from the currency denomination of the foreign currency position to another currency.

**10. Trading facilities**
Most electronic trading facilities are supported by computer-based component systems for the order-routing, execution, matching, registration or clearing of trades. As with all facilities and systems, they are vulnerable to temporary disruption or failure. Your ability to recover certain losses may be subject to limits on liability imposed by the system provider, the market, the clearing house and/or member firms. Such limits may vary. Therefore, you should ask the firm with which you deal for details in this respect.

**11. Electronic trading**
Trading on an electronic trading system may differ not only from trading in an open-outcry market but also from trading on other electronic trading systems. If you undertake transactions on an electronic trading system, you will be exposed to risks associated with the system including the failure of hardware and software. The result of any system failure may be that your order is either not executed according to your instructions or is not executed at all. Given the high leverage, fast-moving nature of the OTCFX market, and the risks associated with electronic trading, any discrepancies on account statements must be reported to FXCM, in writing, within 24 hours of its occurrence.

**12. Off-exchange transactions**
In some jurisdictions, and only then in restricted circumstances, firms are permitted to effect off-exchange transactions. The firm with which you deal may be acting as your counterparty to the transaction. Forex Capital Markets, LLC functions as a direct counterparty to Traders in many currency transactions. Forex Capital Markets, LLC neither offers the right to offset, nor guarantees a market in which to offset, transactions it effects as a counterparty. Therefore, it may be difficult or impossible to liquidate an existing position, to assess its value, to determine a fair price or to assess the exposure to risk. For these reasons, these transactions may involve increased risks. Off-exchange transactions may be less regulated or subject to a separate regulatory regime. Before you undertake such transactions, you should familiarize yourself with applicable rules and attendant risks.

## NOTICE TO TRADERS

**This Client Agreement is a Legal Contract. Please Read It Carefully.**

This is a legal contract between Forex Capital Markets, LLC, (hereinafter referred to as FXCM) a limited liability corporation organized under the laws of the state of Delaware, its successors and assigns, and the party (or parties) executing this document.

In connection with opening an account to speculate and/or purchase and/or sell cash or spot foreign currency (hereinafter referred to as "Currency" or "Spot") through the OTC foreign exchange markets (hereinafter referred to as "OTCFX") with FXCM, Trader acknowledges that it has been advised and understands the following factors concerning trading in leveraged OTCFX, in addition to those contained in the Risk Disclosure Statement which has been provided to Trader. More specifically, the terms OTCFX and Spot as used herein shall mean the purchase or sale of a foreign currency in such amounts and under such conditions that the parties may negotiate.

1. There are no guarantees to the credit worthiness of the counterparty of your Spot position. Every attempt has been made to deal with reputable creditworthy banks/clearing houses. Also, there may be certain cases in which trading liquidity decreases causing trading in a certain currency to cease, thereby preventing the liquidation of an adverse position that may result in a substantial financial loss.

2. Trading in OTCFX is suitable only for those sophisticated institutions or participants financially able to withstand losses that may substantially exceed the value of margins or deposits. OTCFX accounts are not available through FXCM to non-sophisticated participants.

3. Trader acknowledges that the purchase or sale of a Currency always includes delivery to the extent that Trader's account shall be credited with each Spot transaction.

4. FXCM's margin policies and/or the policies of those banks/clearing houses through which trades are executed may require that additional funds be provided to properly margin Trader's account and that Trader is obligated to immediately meet such margin requirements. Failure to meet requirements may result in the liquidation of any open positions with a resultant loss. FXCM also reserves the right to refuse to accept any order or guarantee a market in which to offset.

5. OTCFX business is not traded on an organized exchange and therefore does not require open-outcry. Even though quotations or prices are afforded by many computer-based component systems, the quotations and prices may vary due to market liquidity.

Disclaimers:

a) Internet or Wireless failures:
Since FXCM does not control signal power, its reception or routing via Internet, configuration of your equipment or reliability of its connection, we cannot be responsible for communication failures, distortions or delays when trading on-line (via Internet or Mobile services).

b) Market risks and on-line trading:
Trading currencies involves substantial risk that is not suitable for everyone. See Trader Agreement for more detailed description of risks. Trading on-line, no matter how convenient or efficient, does not necessarily reduce risks associated with currency trading.

c) Password protection:
The Trader is obligated to keep passwords secret and ensure that third parties do not obtain access to the trading facilities. The Trader will be liable to FXCM for trades executed by means of the Trader's password even if such use may be wrongful.

d) Quoting and Execution Errors:
Should quoting and/or execution errors occur, which may include, but are not limited to, a dealer's mistype of a quote, a quote or trade which is not representative of fair market prices, an erroneous price quote from a Trader, such as but not limited to a wrong big figure quote or an erroneous quote due to failure of hardware, software or communication lines or systems and/or inaccurate external data feeds provided by third-party vendors, FXCM will not be liable for the resulting errors in account balances. In addition, orders must be placed allowing sufficient time to execute, as well as, sufficient time for the system to calculate necessary margin requirements. The execution of orders placed too close to prices, which would trigger other orders (regardless of order type) or a margin call, cannot be guaranteed. FXCM will not be liable for the resulting margin call, resulting balance, and/or positions in the account due to the system not having been allowed sufficient time to execute and/or calculate accordingly. The foregoing list is not meant to be exhaustive and in the event of a quoting or execution error, FXCM reserves the right to make the necessary corrections or adjustments on the account involved. Any dispute arising from such quoting or execution errors will be resolved by FXCM in its sole and absolute discretion. Trader agrees to indemnify and hold FXCM harmless from all damages or liability as a result of the foregoing.

e) Arbitrage:
Internet, connectivity delays, and price feed errors sometimes create a situation where the prices displayed on FXCM's Trading Station and any other licensed trading platforms (hereinafter referred to collectively as "FXCM Trading Station"), do not accurately reflect the market rates. The concept of arbitrage and "scalping", or taking advantage of these Internet delays, cannot exist in an OTC market where the client is buying or selling directly from the market maker. FXCM does not permit the practice of arbitrage on the FXCM Trading Station. Transactions that rely on price latency arbitrage opportunities may be revoked. FXCM reserves the right to make the necessary corrections or adjustments on the account involved. Accounts that rely on arbitrage strategies may at FXCM's sole discretion be subject to dealer intervention and dealer approval of any orders and/or termination of trader's account. Any dispute arising from such arbitrage and/or manipulation will be

resolved by FXCM in its sole and absolute discretion. FXCM reserves the right to withhold withdrawals until such matters are resolved. Any action or resolution stated herein shall not waive or prejudice any rights or remedies which FXCM may have against you, your company and its officers, all of which are expressly reserved.

**f)    Price, Execution, and Platform Manipulation:**
FXCM strictly forbids any form of manipulation of its prices, execution, and trading platforms. FXCM reserves the right to investigate and review any account FXCM suspects of manipulation and withhold funds suspected of being derived from such activity. FXCM reserves the right to make the necessary corrections or adjustments on the account involved. Accounts that are suspected of manipulation may at FXCM's sole discretion be subject to dealer intervention and dealer approval of any orders and/or termination of trader's account. Any dispute arising from such arbitrage and/or manipulation will be resolved by FXCM in its sole and absolute discretion. FXCM at its own discretion may report such incidents to any relevant regulatory and law enforcement authority. Any action or resolution stated herein shall not waive or prejudice any rights or remedies which FXCM may have against you, your company and its officers, all of which are expressly reserved.

**g)    Trade Execution:**
All accounts of Trader will be set to either the "No Dealing Desk" ("NDD") execution or "Dealing Desk" ("DD") execution in FXCM's sole and absolute discretion. Additionally, FXCM exclusively reserves the right to transfer accounts from one option to the other at any time. Traders on both DD and NDD execution may experience widened spreads and slippage under certain market conditions including, however not limited to, when the trading desk is closed, around fundamental announcements, and at times of extreme market volatility. The trading desk is closed 4:00 PM EST Friday afternoon through 5:15 PM EST Sunday afternoon. Market, stop, and stop entry orders due for execution during this time will be filled at the opening rate when the trading desk resumes quoting. Limit and limit entry orders due for execution during this time will be filled at the price requested by Trader when the trading desk resumes quoting. NDD market, stop and stop entry orders are executed at the next best market-price available. All NDD orders may involve circumstances under which the full order gets executed, and other circumstances under which only part, or perhaps even none, of the order gets executed. The NDD setting offers Trader the ability to trade directly on prices that are streaming from the multiple banks and financial institutions that provide liquidity for FXCM. All of the above information is subject to change and/or suspension based upon available liquidity or the lack thereof.

All orders are subject to final approval by FXCM and may be rejected at any time. FXCM is compensated through the bid-ask spread regardless of whether an account is set to NDD or DD execution. In the event that FXCM's liquidity providers are unable to provide such liquidity, then Trader may also lose access to streaming prices and be unable to place trades during this time. When such liquidity lapses occur, Trader agrees to indemnify FXCM for any and all losses that may occur due to said volatility and/or movement in the market.

6. In OTCFX, firms are not restricted to effect exchange transactions. The firm with which you deal, such as FXCM, may be acting as your counterparty to the transaction. It may be difficult or impossible to liquidate an existing position, to assess the value, to determine a fair price or to assess the exposure to risk. For these reasons, these transactions may involve increased risks. Off-exchange transactions may be less regulated or subject to a separate regulatory regime. Before you undertake such transactions, you should familiarize yourself with applicable rules and attendant risks.

7. In the event that Trader grants trading authority or control over Trader's account to a third party (Trading Agent), whether on a discretionary or non-discretionary basis, FXCM shall in no way be responsible for reviewing Trader's choice of such Trading Agent or for making any recommendations with respect thereto. FXCM makes no representations or warranties concerning any Trading Agent; FXCM shall not be responsible for any loss to Trader occasioned by the actions of the Trading Agent; and FXCM does not, by implication or otherwise endorse or approve of the operating methods of the Trading Agent. If Trader gives the Trading Agent authority to exercise any of its rights over its account, Trader does so at his own risk.

8. FXCM does not control, and cannot endorse or vouch for the accuracy or completeness of any information or advice Trader may have received or may receive in the future from Referring Broker (hereby defined as the agent(s) that referred Client to FXCM, and includes such referring broker, its employees, subsidiaries, sub-agents, referring agent(s) and affiliates) (see section Referral Disclosure below) or from any other person not employed by FXCM regarding Forex trading or the risks involved in such trading. If Referring Broker or any other third party provides Trader with information or advice regarding Forex trading, FXCM shall in no way be responsible for any loss to Trader resulting from Trader's use of such information or advice. Trader understands that Referring Broker and many third party vendors of trading systems, courses, programs, research or recommendations may or may not be regulated by a government agency.

### REFERRAL DISCLOSURE

FXCM AND REFERRING BROKER ARE WHOLLY SEPARATE AND INDEPENDENT FROM ONE ANOTHER. THE CLIENT AGREEMENT BETWEEN FXCM AND REFERRING BROKER DOES NOT ESTABLISH A JOINT VENTURE OR PARTNERSHIP AND REFERRING BROKER IS NOT AN AGENT OR EMPLOYEE OF FXCM.

1.    FXCM does not control, and cannot endorse or vouch for the accuracy or completeness of any information or advice Client may have received or may receive in the future from Referring Broker or from any other person not employed by FXCM regarding foreign currency or exchange ("Forex") trading or the risks involved in such trading.

2.    FXCM provides risk disclosure information to all new Clients when they open accounts. Client should read that information carefully, and should not rely on any information to the contrary from any other source.

3.    Client acknowledges that no promises have been made by FXCM or any individual associated with FXCM regarding future profits or losses in Client's account. Client understands that Forex trading is very risky, and that many people lose money trading.

4.    If Referring Broker or any other third party provides Client with information or advice regarding Forex trading, FXCM shall in no way be responsible for any loss to Client resulting from Client's use of such information or advice.

5.    To the extent Client has previously been led to believe or believes that utilizing any third party trading system, course, program, research or recommendations provided by Referring Broker or

any other third party will result in trading profits, Client hereby acknowledges, agrees and understands that all Forex trading, including trading done pursuant to a system, course, program, research or recommendations of Referring Broker or another third party involves a substantial risk of loss. In addition, Client hereby acknowledges, agrees and understands that the use of a trading system, course, program, research or recommendations of Referring Broker or another third party will not necessarily result in profits, avoid losses or limit losses.

6.    Client understands that Referring Broker and many third party vendors of trading systems, courses, programs, research or recommendations are not regulated by a government agency.

7.    Because the risk factor is high in foreign currency transactions trading, only genuine "risk" funds should be used in such trading. If Client does not have the extra capital the Client can afford to lose, Client should not trade in the foreign currency markets.

8.    Client understands and acknowledges that FXCM may compensate Referring Broker for introducing Client to FXCM and that such compensation may be on a per-trade basis or other basis. Such compensation to the Referring Broker may require the Client to incur a mark-up, above and beyond the ordinary spread generally provided by FXCM.   Further, the Client has a right to be informed of the precise nature of such remuneration.

9.    FXCM does not endorse or vouch for the services provided by the Referring Broker. Since Referring Broker is not an employee or agent of FXCM, it is the account holder's responsibility to perform necessary due diligence on the Referring Broker prior to using any of their services.

10.    Client understands and agrees that if Client's account with FXCM is introduced by Referring Broker that Referring Broker may be provided access to certain personal information about Client as well as certain information concerning trading activity in Client's FXCM account.   In the event that the Referring Broker is appropriately authorized by a regulatory body, client agrees that Referring Broker may be provided with a copy of the client's application. Referring Broker shall not have the right to enter into any trades on Client's FXCM account unless specifically authorized by Client through execution of a limited power of attorney granting Referring Broker authority to make trading decisions for Client's account.

Should you have any questions regarding the risks of trading in foreign currency, please contact your account representative.

### TRADER AGREEMENT

In consideration of FXCM agreeing to carry one or more accounts of the undersigned ("Trader" or "Client") and providing services to Trader in connection with the purchase and sale of cash currencies (including financial instruments) and any similar instruments (collectively referred to as "OTCFX"), which may be purchased or sold by or through FXCM for Trader's accounts(s), Trader agrees as follows:

1.    AUTHORIZATION TO TRADE.   FXCM is authorized to purchase and sell OTCFX for Trader's account(s) with a counter party bank or sophisticated institutions or participants in accordance with Trader's oral or written or computer instructions.   Unless instructed by Trader to the contrary in writing, FXCM is authorized to execute all orders with such banking institutions, counter party, bank, or sophisticated institutional participants as FXCM deems appropriate. FXCM shall be entitled to rely upon any oral or written communication or instructions received from Trader, including Trader's officers, partners, principals or employees, so long as FXCM does not have actual knowledge of the lack of authority of any such person ("Authorized Persons"). Trader agrees that such Authorized Persons are authorized on its behalf to furnish FXCM all data, information, instructions and authorizations required by FXCM to perform its services under this Client Agreement.

Trader authorizes FXCM to rely and act upon any instruction, authorization, data or information, which appear to be given by an Authorized Person to FXCM by any means, including instructions transmitted by electronic means or otherwise, and the production of a facsimile of a document purporting to bear the authorization of Trader. Trader therefore agrees that: (i) FXCM is authorized to act upon instructions without enquiring as to the validity of the instructions and to consider the instructions of like force and effect as written orders made by the Authorized Persons; (ii) Nothing in this section and no verification or attempted verification of any instruction or signatures at any time made by FXCM will obligate FXCM to verify the validity of the instructions or the signatures in any particular case; and (iii) Trader will bear the risk of all unauthorized instructions, by any of its representatives, employees, or agents, and where FXCM has acted in good faith and without negligence, Trader will indemnify FXCM against and save FXCM harmless from all losses, costs, fees, damages, expenses, claims, suits, demands and liabilities whatsoever that FXCM may suffer or incur or that may be brought against FXCM, in any way relating to or arising out of FXCM acting upon, delaying in acting upon or refusing to act upon any instruction or information provided to FXCM by Trader, including improper, unauthorized or fraudulent instructions given by any of Trader's employees, agents or representatives, even if such instructions were not in fact made with Trader's authority.

2. GOVERNMENTAL, COUNTERPARTY INSTITUTION AND INTERBANKING SYSTEM RULES. All transactions under this Client Agreement shall be subject to the constitution, by-laws, rules, regulations, customs, usage, rulings and interpretations of the counterparty institution or other interbank market (and its clearing organization, if any) where executed and to all applicable Federal and State laws and regulations. If any statute shall hereafter be enacted or any rule or regulation shall hereafter be adopted which shall be binding upon FXCM and shall affect in any manner or be inconsistent with any of the provisions hereof, the affected provisions of this Client Agreement shall be deemed modified or superseded, as the case may be by the applicable provisions of such statute, rule or regulation, and all other provisions of this Client Agreement and provisions so modified shall in all respects continue in full force and effect.   Trader acknowledges that all transactions under this Client Agreement are subject to the aforementioned regulatory requirements and Trader shall not therebybe given any independent legal or contractual rights with respect to such requirements.

3. MARGINS AND DEPOSIT REQUIREMENTS. Trader shall provide to and maintain with FXCM margin in such amounts and in such forms as FXCM, in its sole discretion, may require. Trader is aware and acknowledges that the requirements for margin vary, and may be changed from time to time, at FXCM's sole discretion, based upon account size, volume traded, and market conditions. Such margin requirements may be greater or less than margins required by a counterparty bank. FXCM may change margin requirements at any time. Trader agrees to deposit by immediate wire transfer such additional margin when and as required by FXCM and will promptly meet all margin calls in such mode of transmission as FXCM in its sole discretion designates. FXCM may at any time proceed to liquidate Trader's account in accordance with paragraph 7 below and any failure by

2

FXCM to enforce its rights hereunder shall not be deemed a waiver by FXCM to enforce its rights thereafter. No previous margin requirement by FXCM shall preclude FXCM from increasing that requirement without prior notice. FXCM retains the right to limit the amount and/or total number of open positions that Trader may acquire or maintain at FXCM. FXCM will attempt to execute all orders, which it may, in its sole discretion, choose to accept in accordance with the oral, written, or computer instructions of Trader's. FXCM reserves the right to refuse to accept any order or guarantee a market in which to offset. FXCM shall not be responsible for any loss or damage caused, directly or indirectly, by any events, actions or omissions beyond the control of FXCM including, without limitation, loss or damage resulting, directly or indirectly, from any delays or inaccuracies in the transmission of orders and/or information due to a breakdown in or failure of any transmission or communication facilities.

4. PRIVACY POLICY. FXCM respects each individual's right to privacy. We value our relationship with you, and we take pride in maintaining loyalty and respect with each individual client by providing you with security. The provisions of this notice apply to former Clients as well as our current Clients.

a. Personal Information. When you apply for or maintain a live account with FXCM, we collect personal information about you for business purposes, such as evaluating your financial needs, processing your requests and transactions, informing you about products and services that may be of interest to you, and providing customer service. Such information may include: Application Information - information you provide to us on applications and other forms, such as your name, address, birth date, social security number, occupation, assets, and income. Transaction Information - Information about your transactions with us and with our affiliates as well as Information about our communications with you (Examples include your account balances, trading activity, your inquiries and our responses). Verification Information - Information necessary to verify your identity such as a passport or driver's license (Examples also include background information about you we receive from public records or from other entities not affiliated with FXCM). The USA Patriot Act requires us to collect information and take actions necessary to verify your identity.

b. About Cookies. Cookies are small files containing information that a Web site uses to track its visitors. FXCM may set and access FXCM cookies on your computer, enabling us to learn which advertisements and promotions bring users to our website. FXCM or any of its divisions may use cookies in connection with FXCM's products and services and to track your activities on our websites. Such information that we collect and share would be anonymous and not personally identifiable.

c. Security Technology. FXCM uses Secure Socket Layer (SSL) encryption technology in order to protect certain information that you submit. This type of technology protects you from having your information intercepted by anyone other than FXCM while it is being transmitted to us. We work hard to ensure that our websites are secure and that they meet industry standards. We also use other safeguards such as firewalls, authentication systems (e.g., passwords and personal identification numbers) and access control mechanisms to control unauthorized access to systems and data.

d. Sharing Information with our Affiliates. We may share personal information described above with our affiliates for business purposes, such as, but not limited to, servicing Client accounts and informing Clients about new products and services, or to aid in the trading activity of the company, its affiliates, or employees, and as permitted by applicable law. Our affiliates may include companies controlled or owned by us as well as companies that have an ownership interest in our company. The information we share with affiliates may include any of the information described above, such as your name, address, trading and account information. Our affiliates maintain the privacy of your information to the same extent FXCM does in accordance with this Policy.

e. Sharing Information with Third Parties. FXCM does not disclose your personal information to third parties, except as described in this Policy. Third party disclosures may include sharing such information with non-affiliated companies that perform support services for your account or facilitate your transactions with FXCM, including those that provide professional, legal, or accounting advice to FXCM. Non-affiliated companies that assist FXCM in providing services to you are required to maintain the confidentiality of such information to the extent they receive it and to use your personal information only in the course of providing such services and only for the purposes that FXCM dictates. Additionally, in order to comply with the Commodity Futures Trading Commission ("CFTC") regulations, FXCM is obligated to regularly transmit copies of all account statements of any Client who is a related person of a Retail Forex Counterparty, as defined in Section 5.18 of the CFTC Regulation of Off-Exchange Retail Foreign Exchange Transactions and Intermediaries, to the related Retail Forex Counterparty. A related person when used in reference to a Retail Forex Counterparty means any general partner, officer, director, owner of more than ten percent of the equity interest, associated person or employee of the Retail Forex Counterparty, and any relative or spouse of any of the foregoing persons, or any relative of such spouse, who shares the same home as any of the foregoing persons. Furthermore, we may also disclose your personal information to third parties to fulfill your instructions or pursuant to your express consent. We want you to know that FXCM will not sell your personal information

f. Regulatory Disclosure. Under limited circumstances, FXCM may disclose your personal information to third parties as permitted by, or to comply with, applicable laws and regulations. For example, we may disclose personal information to cooperate with regulatory authorities and law enforcement agencies to comply with subpoenas or other official requests, and as necessary to protect our rights or property. Except as described in this privacy policy, we will not use your personal information for any other purpose unless we describe how such information will be used at the time you disclose it to us or we obtain your permission.

g. Opt Out. You are not required to supply any of the personal information that we may request. However, failure to do so may result in our being unable to open or maintain your account or to provide services to you. While we make every effort to ensure that all information we hold about you is accurate, complete and up to date, you can help us considerably in this regard by promptly notifying us if there are any changes to your personal information. If you do not wish to have your personal information disclosed to our affiliates or other third parties as described in this Policy, please contact us via e-mail at: compliance@fxcm.com or send your request to: Forex Capital Markets LLC Attention: Privacy Officer, Financial Square, 32 Old Slip, 10th Floor, New York, NY 10005. Please be advised that if we receive such instruction we will not be able to service your account and must close any open and funded accounts that you have.

5. SETTLEMENT DATE AND ROLLOVERS. All Spot currency positions will be posted to Trader's account in U.S. Dollars or other mutually agreed upon currency on the trade date and settled within 48 hours. The resulting position will automatically rollover for an additional 48 hour period unless (i) Trader gives satisfactory instructions for further delivery of the foreign currency subject to FXCM's usual and customary charges and re-delivery fees; or (ii) a Trader enters an order which is

accepted by FXCM in its sole discretion to offset the Spot currency position. Trader, by noon of the business day before the settlement date of the Spot currency position, shall provide FXCM with acceptable re-delivery or offset instructions. In the absence of timely and adequate instructions from Trader, FXCM is authorized, at FXCM's absolute discretion, to rollover the Currency positions in the OTCFX account(s) for Trader's Account(s) and at Trader's risk. A position may be credited or debited interest charges until the position is closed.

6. COLLATERAL AND LENDING AGREEMENT. All funds, currencies, and other property of Trader which FXCM or its affiliates may at any time be carrying for Trader (either individually, jointly with another, or as a guarantor of the account of any other person,) or which may at any time be in its possession or control or carried on its books for any purpose, including safekeeping, are to be held by FXCM as security and subject to a general lien and right of set-off for liabilities of Trader to FXCM whether or not FXCM has made advances in connection with such funds, currencies or other property, and irrespective of the number of accounts Trader may have with FXCM. FXCM may in its discretion, at any time and from time to time, without notice to Trader, apply and/or transfer any or all funds, currencies or other property of Trader between any of Trader's accounts. Trader hereby also grants to FXCM the right to pledge, re-pledge, hypothecate, invest or loan, either separately or with the property of other Traders, to itself as broker or to others, any securities or other property of Trader held by FXCM as margin or security. FXCM shall at no time be required to deliver to Trader the identical property delivered to or purchased by FXCM for any account of Trader. The purpose of the Lending Agreement is to allow FXCM to use the currencies, property, depository receipts as collateral.

7. LIQUIDATION OF ACCOUNTS. In the event of (a) the death or judicial declaration of incompetence of Trader; (b) the filing of a petition in bankruptcy, or a petition for the appointment of a receiver, or the institution of any insolvency or similar proceeding by or against Trader; (c) the filing of an attachment against any of Trader's accounts carried by FXCM, (d) insufficient margin, or FXCM's determination that any collateral deposited to protect one or more accounts of Trader is inadequate, regardless of current market quotations, to secure the account; (e) Trader's failure to provide FXCM any information requested pursuant to this Client Agreement; or (f) any other circumstances or developments that FXCM deems appropriate for its protection, and in FXCM's sole discretion, it may take one or more, or any portion of, the following actions: (1) satisfy any obligation Trader may have to FXCM, either directly or by way of guaranty of suretyship, out of any of Trader's funds or property in its custody or control; (2) sell any or purchase any or all Spot currency positions held or carried for Trader; and (3) cancel any or all outstanding orders, or any other commitments made on behalf of Trader. Any of the above actions may be taken without demand for margin or additional margin, without prior notice of sale or purchase or other notice to Trader, Trader's personal representatives, heirs, executors, administrators, trustees, legatees or assigns and regardless of whether the ownership interest shall be solely Trader's or held jointly with others. In liquidation of Trader's long or short positions, FXCM may, in its sole discretion, offset in the same settlement or it may initiate new long or short positions in order to establish a spread or straddle which in FXCM's sole judgment may be advisable to protect or reduce existing positions in Trader's account. Any sales or purchases hereunder may be made according to FXCM's judgment and at its discretion with any interbank or other exchange market where such business is then usually transacted or at a public auction or private sale, and FXCM may purchase the whole or any part thereof free from any right of redemption. Trader will not be responsible for debit balances directly resulting from trading activity.

8. SETTLEMENT DATE OFFSET INSTRUCTIONS. FXCM in its sole and absolute direction may accept or reject orders to offset current Spot currency positions of Trader. FXCM reserves the right to refuse to accept any order or guarantee a market in which to offset. Offset arrangements on Spot currency positions arriving at settlement date must be negotiated and accepted by FXCM at least one (1) business day prior to the settlement date or rollover.

9. CHARGES. Trader shall pay such brokerage, commission and special service and all other charges (including, without limitation, markups and markdowns, statement charges, idle account charges, order cancellation charges, account transfer charges or other charges), fees (including, without limitation, fees imposed by any interbank agency, bank, contract markets or other regulatory or self-regulatory organizations) arising out of FXCM providing services hereunder. If Trader uses FXCM's "Active Trader" platform, Trader consents to pay a commission charge at a rate of fifty ($50) USD per million base currency traded, per side. FXCM may change its commission, charges, and/or fees without notice. Trader agrees to be liable to FXCM for interest on amounts due from Trader to FXCM at an interest rate equal to three (3) percentage points above the then prevailing prime rate at FXCM principal bank or the maximum interest rate allowed by law, whichever is lower. All such charges shall be paid by Trader as they are incurred, or as FXCM in its sole and absolute discretion, may determine, and Trader hereby authorizes FXCM to withdraw the amount of any such charges from Trader's accounts(s). Trader agrees to pay a transfer fee, to be designated by FXCM in the event Trader instructs FXCM to transfer open positions, moneys, and/or property of Trader's account to another institution. If there are no filled orders in your account for at least one (1) year, you will be subject to a dormant account administrative fee (the "Fee"). The Fee will be equal to the lesser of $50 or the remaining balance in your account. You will be subject to the Fee on a yearly basis thereafter if the conditions stated above are met. If you are assessed the Fee and your account balance becomes zero (0), your account will automatically be closed.

10. STATEMENTS AND CONFIRMATION. Reports of the confirmation of orders and statements of accounts for Trader shall be deemed correct and shall be conclusive and binding upon Trader if not objected to immediately upon receipt and confirmed in writing within (1) day after transmittal to Trader by posting on the internet, or otherwise. Margin calls shall be conclusive and binding unless objected to immediately in writing. In lieu of sending trade confirmation via postal mail, FXCM will provide Trader internet access to view his account at any time with an online login. Written objections on Trader's part shall be directed to FXCM at its home office located at the most recent address as indicated on the FXCM website, and shall be deemed received only if actually delivered or mailed by registered mail, return receipt requested. Failure to object shall be deemed ratification of all actions taken by FXCM or FXCM's agents prior to Trader's receipt of said reports. Trader's failure to receive a trade confirmation shall not relieve Trader of the obligation to object as set out herein. Once an order or trade has been placed, and confirmation has been delivered, it is the sole responsibly of Trader to keep track of the account's orders and positions.

11. COMMUNICATIONS. Reports, statements, notices and any other communications may be transmitted to Trader via the email address on Trader's application, FXCM Trading Station Platform, or to such other email address as Trader may from time to time designate in writing to FXCM. All communications so sent, whether by mail, email, telegraph messenger or otherwise, shall be deemed transmitted by FXCM when electronically submitted or deposited in the United States mail, or when received by a transmitting agent, and deemed delivered to Trader personally, whether actually received by Trader or not.

3

21
**824**

**12. FXCM RESPONSIBILITIES.** FXCM will not be responsible for delays in the transmission of orders due to a breakdown or failure of transmission or communication facilities, electrical power outage or for any other cause beyond FXCM's control or anticipation. FXCM shall only be liable for its actions directly attributable to negligence, willful default or fraud on the part of FXCM. FXCM shall not be liable for losses arising from the default of any agent or any other party used by FXCM under this Client Agreement.

**13. CURRENCY FLUCTUATION RISK.** If Trader directs FXCM to enter into any currency transaction: (a) any profit or loss arising as a result of a fluctuation in the exchange rate affecting such currency will be entirely for Trader's account and risk; (b) all initial and subsequent deposits for margin purposes shall be made in U.S. dollars, in such amounts as FXCM may in its sole discretion require; and (c) FXCM is authorized to convert funds in Trader's account for margin into and from such foreign currency at a rate of exchange determined by FXCM in its sole discretion on the basis of the then prevailing money market rates.

**14. RISK ACKNOWLEDGMENT.** Trader acknowledges that investments in leveraged and non-leveraged transactions are speculative, involves a high degree of risk, and is appropriate only for persons who can assume risk of loss in excess of their margin deposit. Trader understands that because of the low margin normally required in OTCFX trading, price changes in OTCFX may result in significant losses that may substantially exceed Trader's investment and margin deposit. Trader warrants that Trader is willing and able, financially and otherwise, to assume the risk of OTCFX trading, and in consideration of FXCM's carrying his/her account(s), Trader agrees not to hold FXCM responsible for losses incurred through following its trading recommendations or suggestions or those of its employees, agents or representatives. Trader recognizes that guarantees of profit or freedom from loss are impossible of performance in OTCFX trading. Trader acknowledges that Trader has received no such guarantees from FXCM or from any of its representatives or any referring broker or other entity with whom Trader is conducting his/her FXCM account and has not entered into this Client Agreement in consideration of or in reliance upon any such guarantees or similar representations.

**15. TRADING RECOMMENDATIONS.** (a) Trader acknowledges that (i) any market recommendations and information communicated to Trader by FXCM or by any person within the company, does not constitute an offer to sell or the solicitation of an offer to buy any OTCFX position, (ii) such recommendation and information, although based upon information obtained from sources believed by FXCM to be reliable, may be based solely on an opinion and that such information may be incomplete and may be unverified, and (iii) FXCM makes no representation, warranty or guarantee as to, and shall not be responsible for, the accuracy or completeness of any information or trading recommendation furnished to Trader. Trader acknowledges that FXCM and/or its officers, directors, affiliates, associates, stockholders or representatives may have a position in or may intend to buy or sell currencies, which are the subject of market recommendations to Trader, and that the market position of FXCM or any such officer, director, affiliate, associate, stockholder or representative may not be consistent with the recommendations furnished to Trader by FXCM. Trader acknowledges that FXCM makes no representations concerning the tax implications or treatment of trading Forex; and, (b) Trader further acknowledges that should Trader grant trading authority or control over Trader's account to a third party ("Trading Agent"), whether on a discretionary or non-discretionary basis, FXCM shall in no way be responsible for reviewing Trader's choice of such Trading Agent nor making any recommendations with respect thereto. Trader understands that FXCM makes no warranties nor representations concerning the Trading Agent, that FXCM shall not be responsible for any loss to Trader occasioned by the actions of the Trading Agent and that FXCM does not, by implication or otherwise, endorse or approve of the operating methods of the Trading Agent. If Trader gives Trading Agent authority to exercise any of its rights over Trader's account(s), Trader understands that Trader does so at Trader's own risk.

**16. TRADER REPRESENTATIONS AND WARRANTIES.** Trader represents and warrants that: (a) Trader is of sound mind, legal age and legal competence; and, (b) No person other than Trader has or will have an interest in Trader's account(s); and, (c) Trader hereby warrants that regardless of any subsequent determination to the contrary, Trader is suitable to trade OTCFX; and (d) Trader is not now an employee of any exchange, any corporation in which any exchange owns a majority of the capital stock, any member of any exchange and/or firm registered on any exchange, or any bank, trust, or insurance company that trades the same instruments as those offered by FXCM, and that in the event that Trader becomes so employed, Trader will promptly notify FXCM at its home office in writing of such employment; and, (e) All the information provided in the information portion of this Client Agreement is true, correct and complete as of the date hereof and Trader will notify FXCM promptly of any changes in such information; and (f) Trader will not enter into any Trade for the purposes of arbitrage, scalping or to exploit any temporal and/or minor inaccuracy in any exchange rate.

**17. DISCLOSURE OF FINANCIAL INFORMATION.** The Trader represents and warrants that the financial information disclosed to FXCM in this document is an accurate representation of the Trader's current financial condition. The Trader represents and warrants that in determining the Trader's Net Worth, Assets and Liabilities were carefully calculated then Liabilities were subtracted from Assets to determine the value that the Trader has included in the financial information as Net Worth. The Trader represents and warrants that in determining the value of Assets, the Trader included cash and/or cash equivalents, U.S. Government and Marketable securities, real estate owned (excluding primary residence), the cash value of life insurance and other valuable Assets. The Trader represents and warrants that in determining the value of Liabilities, the Trader included notes payable to banks (secured and unsecured), notes payable to relatives, real estate mortgages payable (excluding primary residence) and other debts. The Trader represents and warrants that in determining the Trader's Liquid Assets the Trader included only those Assets that can be quickly (within one day's time) converted to Cash. The Trader represents and warrants that the Trader has very carefully considered the portion of the Trader's assets which the Trader considers to be Risk Capital. The Trader recognizes that Risk Capital is the amount of money the Trader is willing to put at risk and if lost would not, in any way, change the Trader's lifestyle. The Trader agrees to immediately inform FXCM if the Trader's financial condition changes in such a way to reduce the Trader's Net Worth, Liquid Assets and/or Risk Capital.

**18. NO GUARANTEES.** Trader acknowledges that Trader has no separate agreement with Trader's broker or any FXCM employee or agent regarding the trading in Trader's FXCM account, including any agreement to guarantee profits or limit losses in Trader's account. Trader understands that Trader is under an obligation to notify FXCM's Compliance Officer immediately in writing as to any agreement of this type. Further, Trader understands that any representations made by anyone concerning Trader's account that differ from any statements Trader receives from FXCM must be brought to the attention of FXCM's Compliance Officer immediately in writing. Trader understands that Trader must authorize every transaction prior to its execution unless Trader has delegated discretion to another party by signing FXCM's limited power of attorney (LPOA), and any disputed transactions must be brought to the attention of FXCM's Compliance

Officer pursuant to the notice requirements of this Client Agreement. Trader agrees to indemnify and hold FXCM harmless from all damages or liability resulting from Trader's failure to immediately notify FXCM's Compliance Officer of any of the occurrences referred to herein. All notices required under this section shall be sent to FXCM at its home office.

**19. CREDIT.** Trader authorizes FXCM or agents acting on behalf of FXCM to investigate Trader's credit standing and in connection therewith to contact such banks, financial institutions and credit agencies as FXCM shall deem appropriate to verify information regarding Trader. Trader further authorizes FXCM to investigate Trader's current and past investment activity, and in connection therewith, to contact such futures commission merchants, exchanges, broker/dealers, banks, and compliance data centers as FXCM shall deem appropriate. Upon reasonable request made in writing by Trader to FXCM, Trader shall be allowed to review any records maintained by FXCM relating to Trader's credit standing. Trader shall also be allowed, at Trader's sole cost and expense, to copy such records.

**20. JOINT ACCOUNTS.** (a) If this account is held by more than one (1) person, all of the joint holders are jointly and severally liable to FXCM for any and all obligations arising out of transactions in the account and agree to be bound by all terms and conditions of this Client Agreement signed by each party. FXCM is authorized to accept instructions and to send confirmations to any one of the joint owners, and the Client hereby further appoints any and all of said joint owners as Client's agent for receipt of confirmations and hereby waives any right to receive confirmations otherwise. Any one or more of the joint owners shall have full authority for the account and risk in the name of the joint account.

(b) If this account is a joint account, in the event of the death of any of the Client's, the survivor(s) shall immediately give FXCM written notice thereof, and FXCM, before or after receiving such notice, may take such action, institute such proceedings, require such papers, retain such portion of the account, and restrict transactions in the account as FXCM may deem advisable to protect FXCM against any tax, liability, penalty, or loss under any present or future laws or otherwise. The estate(s) of any of the Clients who shall have died shall be liable, and the survivor(s) shall continue to be liable, to FXCM for any debit balance or loss in the account in any way resulting from the completion of transactions initiated prior to the receipt by FXCM of the written notice of the death of the decedent, or incurred in the liquidation of the account, or the adjustment of the interests of the respective parties.

(c) If this account is held by tenants in common, then, in the event that the account is closed or upon receipt of a certified document evidencing death or legal incapacity of any tenant, the account shall be divided in equal shares unless FXCM is otherwise notified, in writing, signed by all joint owners of the amounts to be distributed to the individual joint owners.

(d) If this account is held by the parties as joint tenants with rights of survivorship, then, upon receipt of a certified document evidencing death or legal incapacity of one of the parties, the remaining party or parties shall continue this account in their name as sole or joint owners with all the terms and conditions of said account continuing in full force and effect.

**21. NO WAIVER.** No provision of this Client Agreement may be waived unless the waiver is in writing and signed by both Trader and an authorized officer of FXCM. No waiver of this Client Agreement may be implied from any course of dealing between the parties or from any failure by FXCM or its agents to assert its rights under this Client Agreement on any occasion or series of occasions.

**22. GOVERNING LAW AND JURISDICTION.** This Client Agreement, and the rights and obligations of the parties hereto, shall be governed by, construed and enforced in all respects by the laws of the State of New York, where FXCM's principal order execution facilities are located, and without regard to laws that would otherwise apply under applicable choice of law principles.

**23. BINDING EFFECT.** This Client Agreement shall be continuous and shall cover, individually and collectively, all accounts of Trader at any time opened or reopened with FXCM irrespective of any change or changes at any time in the personnel of FXCM or its successors, assigns, or affiliates. This Client Agreement including all authorizations, shall inure to the benefit of FXCM and its successors and assigns, whether by merger, consolidation or otherwise, and shall be binding upon Trader and/or the estate, executor, trustees, administrators, legal representatives, successors and assigns of Trader. Trader hereby ratifies all transactions with FXCM effected prior to the date of this Client Agreement, and agrees that the rights and obligations of Trader in respect thereto shall be governed by the terms of this Client Agreement.

**24. TERMINATION.** This Client Agreement shall continue in effect until termination, and may be terminated by Trader at any time when Trader has no open Spot currency position(s) and no liabilities held by or owed to FXCM upon the actual receipt by FXCM at its home office of written notice of termination, or at any time whatsoever by FXCM upon the transmittal of written notice of termination to Trader; provided, that such termination shall not affect any transactions previously entered into and shall not relieve either party of any obligations set out in this Client Agreement nor shall it relieve Trader of any obligations arising out of any deficit balance.

**25. ACCOUNT TRANSFER AND ASSIGNMENT.** Trader authorizes FXCM to transfer and assign Trader's account and this Client Agreement to another futures commission merchant or an affiliate thereof or any other legal entity. Trader may not transfer or assign this Client Agreement without FXCM's prior written consent, any purported assignment by Trader is null, void, and ineffective, and FXCM need not recognize the purported assignment by Trader.

**26. INDEMNIFICATION.** Trader agrees to indemnify and hold FXCM, its affiliates, employees, agents, successors and assigns harmless from and against any and all liabilities, losses, damages, costs and expenses, including attorney's fees, incurred by FXCM arising out of Trader's failure to fully and timely perform Trader's agreements herein or should any of the representations and warranties fail to be true and correct. Trader also agrees to pay promptly to FXCM all damages, costs and expenses, including attorney's fees, incurred by FXCM in the enforcement of any of the provisions of this Client Agreement and any other agreements between FXCM and Trader. Furthermore, FXCM shall NOT be held liable and is released from all claims and losses incurred in such regard if (and to the extent that) the claim or loss was caused or contributed to by (a) Trader's Conduct: The actions or omission to act on the part of Trader or Authorized Persons (b) Forged Signature: Forged or unauthorized signatures on any document in connection with the Trader's account or this Client Agreement; (c) Malfunctions: System malfunction, equipment failure (whether Trader's or FXCM's equipment), system interruption or system unavailability; (d) Delay: Delays, failure or errors in implementing any instruction; and (e) Information: Inaccurate or incomplete instructions received by FXCM from Trader. Additionally, Trader agrees to indemnify and hold FXCM, its affiliates, employees, agents, successors and assigns harmless from and against all liabilities, losses, damages, costs and expenses, including attorneys fees resulting from use of

programmable trading systems, whether built by Trader himself or by any third party and executed on or using the FXCM Trading Station or any other trading platform offered by FXCM.

**27. CROSS TRADE CONSENT.** The undersigned hereby acknowledges and agrees that a situation may arise whereby an officer, director, affiliate, associate, employee, bank, bank employee or dealer associated with FXCM, or FXCM itself, may be the opposing principal or broker for a trade entered for the undersigned's account. The undersigned hereby consents to any such transaction, subject to the limitations and conditions, if any, contained in the Rules or Regulations of any bank, institution, exchange or board of trade upon which such buy or sell orders are executed, and subject to the limitations and conditions, if any, contained in any applicable Regulations of the Commodity Futures Trading Commission, National Futures Association, United States Federal Reserve or other regulatory agency.

**28. TERMS AND HEADINGS.** The term "FXCM" shall be deemed to include FXCM, its divisions, its successors and assigns; the term "home office" is Forex Capital Markets, LLC, Financial Square, 32 Old Slip, 10th Floor, New York, NY 10005 USA; the term "Trader" shall mean the party (or parties) executing the Client Agreement; and the term "Client Agreement" shall include all other agreements and authorizations executed by Trader in connection with the maintenance of Trader's account with FXCM regardless of when executed. The paragraph headings in this Client Agreement are inserted for convenience of reference only and are not deemed to limit the applicability or affect the meaning of any of its provisions.

**29. ACCEPTANCE.** This Client Agreement shall not be deemed to be accepted by FXCM nor become a binding contract between Trader and FXCM until approved by FXCM home office.

**30. CONSENT TO JURISDICTION AND VENUE.** Trader, in order to induce FXCM to accept this Client Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby agrees to the following: (a) Any judicial, administrative action or proceeding, including but, not limited to, arbitration (as provided for in the section "Arbitration Agreement" below) arising directly or indirectly hereunder or in connection with the transactions contemplated hereby, whether brought by Trader or FXCM, shall be held, at the sole discretion of FXCM within New York County, State of New York exclusively. Trader consents and submits to, and waives any and all objections Trader may have to such venue, and further agrees to waive and forego any right Trader may have to transfer or change the venue of any action or proceeding encompassed hereby; and, (b) Trader consents and submits to the jurisdiction of any local, state or federal court located within New York County, State of New York in any action or proceeding arising directly or indirectly hereunder or in connection with the transaction hereby, whether brought by Trader or FXCM.

**31. RECORDINGS.** Trader agrees and acknowledges that all conversations regarding Trader's account(s) between Trader and FXCM personnel may be electronically recorded with or without the use of an automatic tone-warning device. Trader further agrees to the use of such recordings and transcripts thereof as evidence by either party in connection with any dispute or proceeding that may arise involving Trader or FXCM. Trader understands that FXCM destroys such recordings at regular intervals in accordance with FXCM's established business procedures and Trader hereby consents to such destruction.

**32. MODIFICATIONS TO THE CLIENT AGREEMENT.** FXCM reserves the right to change the terms and conditions of this Client Agreement from time to time, and at any time, with or without notice to Trader, by posting such changes on the www.fxcm.com website. Trader is responsible for regularly reviewing these terms and conditions for any modifications and agrees to be bound by same. Trader may not amend this Client Agreement unless such amendment is in writing and signed by both Trader and an authorized officer of FXCM. No oral agreements or instructions to the contrary shall be recognized or enforceable. This instrument and the attachments hereto embody the entire agreement of the parties, superseding any and all prior written and oral agreements and there are no other terms, conditions or obligations other than those contained herein.

**33. ERISA PENSION PLAN PROVISION.** Where Client is a plan covered by ERISA (as defined below), Client acknowledges and understands that FXCM is only providing services hereunder and is not a plan fiduciary as defined in section 3(21) of the Employee Retirement Security Act of 1974 ("ERISA"), and any rules or regulations promulgated there under. FXCM has no discretionary authority or control with respect to Client's purchase or sale of foreign currency and that the furnishing of market recommendations and information by FXCM is solely for Client's convenience and does not constitute the exercise of such authority or control; and there is no agreement, arrangement, or understanding between Client and FXCM that FXCM's recommendations will serve as the primary basis for investment decisions with respect to the assets of Client or that FXCM will render individualized investment advice to Client based on the particular needs of Client. Client further represents that it has full power and authority pursuant to governing agreements and otherwise to enter into this agreement and to engage in transactions in foreign currency of the kind contemplated herein.

**34. SOFTWARE.** Trader, in order to induce FXCM to accept this Client Agreement, acknowledges and agrees that FXCM makes no warranty whatsoever that any software (the "Software") downloaded onto Trader's computer equipment will be compatible with, or operate without interruption on, Trader's computer equipment, nor does FXCM warrant that the Software is or will be uninterrupted, error free or available at all times. You further understand and agree that your download and/or use of the Software will expose you to risks associated with the download and/or use of software that may not be compatible with your computer equipment. You hereby agree to accept such risks, including, but not limited to, failure of or damage to, hardware, software, communication lines or systems, and/or other computer equipment. FXCM expressly disclaims any liability with respect to the foregoing, and you agree to fully indemnify, defend and hold harmless FXCM from any and all damages, liabilities, losses, costs and expenses that may arise therefrom.

## FX AGREEMENT

- All client accounts are a sub-account of one major FXCM account.
- All client accounts will have trades executed via FXCM accounts and trading lines.
- All client accounts will have margin requirements established by the FXCM dealing desk.
- The automated FXCM trading system will distribute profits and losses accordingly to all client accounts.
- FXCM may establish rules and provisions for client accounts, including but not limited to minimum account size, investment time period, commissions and incentive fees, or any other financial arrangements.
- It is the client's responsibility to find out all necessary information about FXCM and ensure that all arrangements are discussed and clearly understood prior to any trading activity.

- It is the client's responsibility to find out all necessary information about a Trading Agent prior to any trading activity, if the account is to be traded by someone other than himself.
- All clients should be aware that guaranteeing any return is illegal. In addition, FXCM is not responsible for any claims or assurances made by FXCM, its employees and/or associates.
- Certified or Cashier's Checks made payable to *Forex Capital Markets.*
- Mailing Address: Please see Website for address information.
- Wire Transfers: Please see Website for wire instructions.
- *Please reference your name on all checks, wire transfers, and correspondence.*

## LENDING AGREEMENT

By signing this Client Agreement, Trader authorizes FXCM and its affiliates to use all funds, securities, currencies and other property of Trader as specified in Paragraph 6 of the Trader Agreement.

## HIGH RISK INVESTMENT

In addition to standard industry disclosures contained in this Client Agreement, you should be aware that margined currency trading is one of the riskiest forms of investment available in the financial markets and may not be suitable for all investors. An account with FXCM permits you to trade foreign currencies on a highly leveraged basis (up to approximately 100 times your account equity or as otherwise permitted by applicable regulation). An initial deposit of US$1,000 may enable the trader to take a maximum position with US$100,000 notional market value. The funds in an account trading at maximum leverage can be completely lost, if the position(s) held in the account has more than a one percent swing in value. Given the possibility of losing an entire investment, speculation in the foreign exchange market should only be conducted with risk capital funds that if lost will not significantly effect your personal or institution's financial well being.

If you have pursued only conservative forms of investment in the past, you may wish to study currency trading further before continuing an investment of this nature. You must realize that you could sustain a total loss of all funds you deposit with your broker as initial margin as well as substantial amounts of capital, when trading currencies, should the market go against your investment. If you wish to continue with your investment, you acknowledge that the funds you have committed are purely risk capital and loss of your investment will not jeopardize your style of living nor will it detract from your future retirement program. Additionally, you fully understand the nature and risks of currency investments, and your obligations to others will not be neglected should you suffer investment losses.

## SOCIAL SECURITY OR TAX ID CERTIFICATION & BACKUP WITHHOLDING STATEMENT

Under penalties of perjury, I certify (1) the number shown on this Client Agreement is the correct Social Security or Taxpayer Identification number and (2) the ownership, or beneficiary, of this account is not subject to backup withholding under Section #3406 (a)(1)(C) of the Internal Revenue Code.

## EMAIL ACKNOWLEDGMENT

Client acknowledge that it is Client's obligation to immediately notify FXCM if there is a change in Client's electronic mail address, or other location to which the electronic records may be provided.

## ADDRESS ACKNOWLEDGMENT

Client acknowledges that it is Client's obligation to notify FXCM of the address or other location to which paper records may be provided, if necessary.

## AUTHORIZATION TO TRANSFER FUNDS

Trader agrees hereby that FXCM may at any time, in the judgment of FXCM and its associates, apply and transfer from Trader's account to any of Trader's other accounts held with FXCM or an affiliate of FXCM or other approved financial institution or its associates any of the moneys, currencies or other property of Trader held either individually or jointly with others to another regulated account of the same said Trader.

## CONSENT TO ELECTRONIC TRANSMISSION OF CONFIRMATIONS & ACCOUNT STATEMENTS

Client hereby consents to have Client's account information and trade confirmations available on the Internet in lieu of having such information delivered to Client via mail or email. Client will be able to access account information via the FXCM website using Client's account login information to access the account. FXCM will post all of Client's account activity and Client will be able to generate daily, monthly and yearly reports of account activity as well as a report of each executed trade. Updated account information will be available no more than twenty-four hours after any activity takes place on Client's account. Posting of account information on Client's online account will be deemed delivery of confirmation and account statements. At all times, account information will include trade confirmations with ticket numbers, purchase and sale rates, used margin, amount available for margin trading, statements of profits and losses, as well as current open or pending positions.

Opt Out. Client may revoke this consent at any time upon written notice to FXCM. However, doing so may result in FXCM being unable to open or maintain Client account or to provide services to Client. If Client does not wish to have account information delivered electronically as described in this Policy, Client must contact FXCM via e-mail at: compliance@fxcm.com or send a request to: Forex Capital Markets LLC Attention: Compliance, Financial Square, 32 Old Slip, 10th Floor, New York, NY 10005. Please be advised that once FXCM receives such instruction FXCM will not be able to service Client's account and will close any open and funded accounts that Client has.

## ARBITRATION AGREEMENT

5

23
**826**

BY AGREEING TO THIS ARBITRATION PROVISION, TRADER MAY BE WAIVING CERTAIN RIGHTS, INCLUDING THE RIGHT TO A JURY TRIAL. TRADER NEED NOT AGREE TO THIS ARBITRATION PROVISION IN ORDER TO OPEN AN ACCOUNT WITH FXCM.

Trader agrees and, by opening one or more accounts for Trader, FXCM also agrees, that any and all disputes, controversies, or claims arising out of this Client Agreement, or the relationships or activities contemplated thereby, including whether or not any such dispute, controversy, or claim is arbitrable, shall be resolved by an Arbitration Panel selected by the National Futures Association ("NFA"), pursuant to the NFA's Code of Arbitration. The award of the NFA Arbitrators, or of the majority of them, shall be final, and judgment upon the award may be entered in any court of competent jurisdiction.

## FXCM MT4 POWERED BY BOSTON TECHNOLOGIES LETTER OF DIRECTION

The following additional terms apply to clients utilizing FXCM MT4 Powered By Boston Technologies ("The Program"). If Client utilizes The Program, Client agrees to the additional terms and authorizes FXCM to act accordingly by signing this Client Agreement.

1. Client wishes to utilize The Program to execute trades and to direct trade orders and trade details to FXCM. Clients utilizing The Program will not be entering trades orders and trade details directly with FXCM, but rather will be entering trade orders and trade details through The Program, a third party. Client hereby authorizes and directs FXCM to enter trades for Client's account in accordance with trading signals generated and sent to FXCM by The Program. In consideration of opening Client's account, Client acknowledges and agrees to the additional terms and conditions, as follows:

(a) Client fully understands that the trade orders and trade details are generated by The Program and not by FXCM and that FXCM's responsibility is to use commercially reasonable efforts to enter orders pursuant to the trade orders and trade details generated by The Program and as received by FXCM. Client confirms that FXCM has not solicited, or in any other way recommended, Client's participation in The Program. Client has made inquires and conducted research into The Program sufficient to make an informed investment decision. FXCM cannot imply or guarantee that Client will make a profit from The Program and Client agrees that FXCM will not be held responsible for The Program's performance or trading losses incurred in Client's account as a result of trading pursuant to The Program.

(b) FXCM will enter trade orders for Client's account in accordance with the trade orders and trade details generated by The Program. Client understands that Client's trading access through The Program will be provided by The Program provider and not by FXCM.

(c) If more than one FXCM client is using the same system or service as The Program, Client acknowledges that FXCM may enter block orders to enhance order execution, in which case a fair and systematic fill allocation method will be employed. Client understands and acknowledges that FXCM will only be responsible for using its commercially reasonable efforts to execute, in a timely fashion, the trade orders and trade details generated by The Program. FXCM shall not be responsible for any error or malfunction of The Program, mechanical or communication line failure, system errors, data failure or any other causes beyond its control. Client acknowledges that FXCM can accept and execute orders only if actually received or generated and then on a "not held" basis (i.e. FXCM shall not be held responsible for the execution of the order at the price indicated or otherwise).

(d) Client has had the opportunity to ask questions on how Client's account will be handled and acknowledges that Client has not purchased The Program from FXCM. Client understands that there is no trading system or recommendation service, including The Program, that is free from the risk of loss. FXCM does not imply or guarantee that Client will make a profit and Client agrees that neither FXCM nor any of its officers, directors, employees, consultants, agents or affiliates will be held responsible for the performance of The Program or trading losses in Client's account.

(e) FXCM may act upon the authority given by this letter of direction until Client revokes the authority by written notice addressed and actually delivered to FXCM, in accordance with the instructions and details on FXCM's website. FXCM may also terminate the authorization over The Program at any time for any reason in its sole discretion and will provide Client with written notice. Client shall be responsible for any open lots in Client's account at the time The Program is terminated. Client shall permit FXCM to execute offsetting orders for any open lots in Client's account at the time the letter of direction is terminated.

(f) Client agrees that, in the absence of willful or wanton misconduct, neither FXCM nor any of its officers, directors, employees, consultants, agents or affiliates will be held liable for any act or omission in the course of or in connection with Client's participation in The Program. Client shall indemnify FXCM, its principals, officers, directors, employees, agents, successor and/or assigns from all losses and/or liability (including reasonable attorney's and/or accountant's fees) incurred or resulting from this letter of direction to utilize The Program, provided that there has been no judicial determination that such liability was the result of gross negligence or recklessness or intentional misconduct by FXCM, and further provided that the conduct that was the basis for such liability was not undertaken in the actual and reasonable belief that it was in the best interest of Client's account.

## FXCM Mobile TS II Trading System (hereinafter referred to as "Mobile TS II") Terms of Service and Risk Disclosure

### Terms of Service:

It is strongly RECOMMENDED that you familiarize yourself with the functionalities of Mobile TS II by using the demo version prior to managing your live account via a portable device.

1. Mobile TS II is comprised of mobile trading software provided exclusively through public telecommunication networks, circuits and other public connections to FXCM's Trading Station. Mobile TS II utilizes public telecommunication network circuits for the transmission of messages. FXCM shall not be liable for any and all circumstances in which you may experience a delay in price quotation or an inability to trade caused by network circuit transmission problems that may arise between you and any Internet service provider, phone service provider, or any other service provider or related to any other problems outside the direct control of FXCM.

2. FXCM will endeavor to use commercially reasonable efforts to ensure the security of information and transactions conducted via Mobile TS II. However, you are obligated and solely responsible to

keep your password(s) and other confidential information secret and ensure that third parties do not obtain access to your account or your portable device. You will be solely liable for any and all trades executed by means of your password(s) even if such use may be wrongful. FXCM may rely on all orders and instructions submitted using your password(s) without further inquiry or verification.

3. You agree that neither FXCM nor its third party service providers will be liable for the reliability or accuracy of the information made available via Mobile TS II. Such information is reasonably believed to be accurate and timely; however, there are no explicit or implicit warranties of accuracy or timeliness in connection therewith or continued availability of this information, and such information should not be relied upon as such.

4. You agree that as between FXCM Trading Station and Mobile TS II, the FXCM Trading Station is the primary means relied upon for all order and trade related services including but not limited to confirmations, account balances, margin balances, price quotes, account status, and account details. In the event of any inconsistencies between FXCM Trading Station and Mobile TS II, FXCM Trading Station shall govern.

5. You agree that you will not rely on the Mobile TS II as your primary means of placing trades. You agree that the Mobile TS II is being provided solely as a convenience and not as an alternative to FXCM Trading Station or telephoning the FXCM trading desk.

### Fees:

If you are trading via an FXCM Micro Account, your account will charged and debited a service fee of $0.10 per 1,000 unit lot for each trade entered using the Mobile TS II.

### Risk Disclosure:

(a) You understand that by choosing to conduct trading activity via Mobile TS II, you assume and accept certain risks for which you agree that neither FXCM nor its third party service provider shall be liable, including but not limited to the risk of: power outages; broken connections; network circuit obstruction or congestion; transmission failures; transmission delays; the risk of delayed communications during periods of increased market volatility; and/or other occurrences outside FXCM's direct control (collectively, "Technical Problems"). Order execution via Mobile TS II is not guaranteed. You hereby agree to indemnify and hold FXCM harmless with respect to any and all losses you may sustain in connection with any and all Technical Problems. Customer service inquiries relating to Technical Problems should be directed to FXCM. However, in no event will FXCM be liable for your inability to engage in trading activity via Mobile TS II and FXCM shall not be responsible for any losses or missed opportunities incurred by you due to the delayed or non-delivery of any order or instruction via Mobile TS II.

(b) You agree that FXCM shall not be responsible for any fees associated with your use of Mobile TS II should you incur any fees from your Internet service provider, phone service provider, or any other service provider used to access Mobile TS II.

(c) Online trading and trading via portable device, no matter how convenient or efficient, do not reduce the risks associated with foreign exchange trading. FXCM will not be liable to you or any third party for the accuracy or timeliness of any and all information provided via Mobile TS II or for any and all actions on such information.

IF YOU HAVE ANY DOUBTS AS TO WHETHER AN ORDER PLACED VIA MOBILE TS II HAS BEEN EXECUTED, YOU SHOULD NOT PLACE ADDITIONAL ORDERS VIA MOBILE TS II; RATHER, YOU SHOULD CONTACT FXCM FOR INFORMATION REGARDING ORDER STATUS OR LOG ON TO THE FXCM TRADING STATION. FXCM'S PHYSICAL TELEPHONE TRADING DESK IS MAINTAINED DURING TRADING HOURS AS AN ALTERNATIVE METHOD OF COMMUNICATION DURING MOBILE TS II SERVICE INTERRUPTIONS OR WHEN EXPERIENCING TECHNICAL PROBLEMS.

## BASIC Disclosure

The National Futures Association keeps records of all formal proceedings against Future Commission Merchants. The information of these proceedings can be found at: http://www.nfa.futures.org/basicnet/.

Forex Capital Markets – Trading Agreement
11APR2011

# RISK DISCLOSURE STATEMENT

OFF-EXCHANGE FOREIGN CURRENCY TRANSACTIONS INVOLVE THE LEVERAGED TRADING OF CONTRACTS DENOMINATED IN FOREIGN CURRENCY CONDUCTED WITH A FUTURES COMMISSION MERCHANT OR A RETAIL FOREIGN EXCHANGE DEALER AS YOUR COUNTERPARTY.

BECAUSE OF THE LEVERAGE AND THE OTHER RISKS DISCLOSED HERE, YOU CAN RAPIDLY LOSE ALL OF THE FUNDS YOU DEPOSIT FOR SUCH TRADING AND YOU MAY LOSE MORE THAN YOU DEPOSIT.

YOU SHOULD BE AWARE OF AND CAREFULLY CONSIDER THE FOLLOWING POINTS BEFORE DETERMINING WHETHER SUCH TRADING IS APPROPRIATE FOR YOU.

(1) TRADING IS NOT ON A REGULATED MARKET OR EXCHANGE – YOUR DEALER IS YOUR TRADING PARTNER WHICH IS A DIRECT CONFLICT OF INTEREST. BEFORE YOU ENGAGE IN ANY RETAIL FOREIGN EXCHANGE TRADING, YOU SHOULD CONFIRM THE REGISTRATION STATUS OF YOUR COUNTERPARTY.

The off-exchange foreign currency trading you are entering into is not conducted on an interbank market, nor is it conducted on a futures exchange subject to regulation as a designated contract market by the Commodity Futures Trading Commission. The foreign currency trades you transact are trades with the futures commission merchant or retail foreign exchange dealer as your counterparty. WHEN YOU SELL, THE DEALER IS THE BUYER. WHEN YOU BUY, THE DEALER IS THE SELLER. As a result, when you lose money trading, your dealer is making money on such trades, in addition to any fees, commissions, or spreads the dealer may charge.

(2) AN ELECTRONIC TRADING PLATFORM FOR RETAIL FOREIGN CURRENCY TRANSACTIONS IS NOT AN EXCHANGE. IT IS AN ELECTRONIC CONNECTION FOR ACCESSING YOUR DEALER. THE TERMS OF AVAILABILITY OF SUCH A PLATFORM ARE GOVERNED ONLY BY YOUR CONTRACT WITH YOUR DEALER.

Any trading platform that you may use to enter off-exchange foreign currency transactions is only connected to your futures commission merchant or retail foreign exchange dealer. You are accessing that trading platform only to transact with your dealer. You are not trading with any other entities or customers of the dealer by accessing such platform. The availability and operation of any such platform, including the consequences of the unavailability of the trading platform for any reason, is governed only by the terms of your account agreement with the dealer.

(3) YOUR DEPOSITS WITH THE DEALER HAVE NO REGULATORY PROTECTIONS.

All of your rights associated with your retail forex trading, including the manner and denomination of any payments made to you, are governed by the contract terms established in your account agreement with the futures commission merchant or retail foreign exchange dealer. Funds deposited by you with a futures commission merchant or retail foreign exchange dealer for trading off-exchange foreign currency transactions are not subject to the customer funds protections provided to customers trading on a contract market that is designated by the Commodity Futures Trading Commission. Your dealer may commingle your funds with its own operating funds or use them for other purposes. In the event your dealer becomes bankrupt, any funds the dealer is holding for you in addition to any amounts owed to you resulting from trading, whether or not any assets are maintained in separate deposit accounts by the dealer, may be treated as an unsecured creditor's claim.

(4) YOU ARE LIMITED TO YOUR DEALER TO OFFSET OR LIQUIDATE ANY TRADING POSITIONS SINCE THE TRANSACTIONS ARE NOT MADE ON AN EXCHANGE OR MARKET, AND YOUR DEALER MAY SET ITS OWN PRICES.

Your ability to close your transactions or offset positions is limited to what your dealer will offer to you, as there is no other market for these transactions. Your dealer may offer any prices it wishes, and it may offer prices derived from outside sources or not in its discretion. Your dealer may establish its prices by offering spreads from third party prices, but it is under no obligation to do so or to continue to do so. Your dealer may offer different prices to different customers at any point in time on its own terms. The terms of your account agreement alone govern the obligations your dealer has to you to offer prices and offer offset or liquidating transactions in your account and make any payments to you. The prices offered by your dealer mayor may not reflect prices available elsewhere at any exchange, interbank, or other market for foreign currency.

7

25
**828**

## (5) PAID SOLICITORS MAY HAVE UNDISCLOSED CONFLICTS

The futures commission merchant or retail foreign exchange dealer may compensate introducing brokers for introducing your account in ways which are not disclosed to you. Such paid solicitors are not required to have, and may not have, any special expertise in trading, and may have conflicts of interest based on the method by which they are compensated. Solicitors working on behalf of futures commission merchants and retail foreign exchange dealers are required to register. You should confirm that they are, in fact registered. You should thoroughly investigate the manner in which all such solicitors are compensated and be very cautious in granting any person or entity authority to trade on your behalf. You should always consider obtaining dated written confirmation of any information you are relying on from your dealer or a solicitor in making any trading or account decisions.

FINALLY, YOU SHOULD THOROUGHLY INVESTIGATE ANY STATEMENTS BY ANY DEALERS OR SALES REPRESENTATIVES WHICH MINIMIZE THE IMPORTANCE OF, OR CONTRADICT, ANY OF THE TERMS OF THIS RISK DISCLOSURE. SUCH STATEMENTS MAY INDICATE POTENTIAL SALES FRAUD.

THIS BRIEF STATEMENT CANNOT, OF COURSE, DISCLOSE ALL THE RISKS AND OTHER ASPECTS OF TRADING OFF-EXCHANGE FOREIGN CURRENCY TRANSACTIONS WITH A FUTURES COMMISSION MERCHANT OR RETAIL FOREIGN EXCHANGE DEALER.

I hereby acknowledge that I have received and understood this risk disclosure statement.

7-6-11

Date

Signature of Customer

8

26
**829**

## PROFITABILITY ANALYSIS

|  | Q2 2010 | Q3 2010 | Q4 2010 | Q1 2011 |
|---|---|---|---|---|
| % Profitable | 23% | 23% | 23% | 27% |
| % Unprofitable | 77% | 77% | 77% | 73% |
| Total Accounts | 17,771 | 15,023 | 18,362 | 20,223 |

## PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS

Over 180,000 tradeable accounts trade through trading platforms offered by FXCM Holdings LLC and its consolidated subsidiaries Forex Capital Markets LLC, Forex Capital Markets Limited , FXCM Asia Limited, FXCM Australia Limited, ODL Securities Limited, and ODL Securities K.K. Japan.

9

27
**830**

## NO DEALING DESK DISCLOSURE

THE FOREIGN CURRENCY TRADING YOU ARE ENTERING INTO IS NOT CONDUCTED ON AN EXCHANGE. FXCM IS ACTING AS A COUNTERPARTY IN THESE TRANSACTIONS AND, THEREFORE, ACTS AS THE BUYER WHEN YOU SELL AND THE SELLER WHEN YOU BUY. THE PRICES FXCM OFFERS MIGHT NOT BE THE BEST PRICES AVAILABLE AND FXCM MAY OFFER DIFFERENT PRICES TO DIFFERENT CLIENTS.

ALTHOUGH FXCM IS THE COUNTERPARTY TO EACH OF YOUR TRADES, IF YOUR ACCOUNT(S) IS TO BE TRADED UNDER A "NO DEALING DESK" MODEL FXCM LIMITS RISK TO ITSELF BY IMMEDIATELY HEDGING (OFFSETTING) THE TRADES AND POSITIONS IT ENTERS INTO WITH YOU 1-FOR-1 WITH ONE OF SEVERAL BANK MARKET MAKERS. AS A RESULT, FXCM DOES NOT PROFIT WHEN YOU LOSE MONEY ON A TRADE. RATHER, FXCM IS COMPENSATED BY MARKING UP THE PRICE IT RECEIVES FROM THE BANK MARKET MAKER.

IN SOME CIRCUMSTANCES FXCM MAY ELECT TO REMOVE YOU FROM "NO DEALING DESK" MODEL. FXCM WILL NOTIFY YOU AT THE TIME THAT IT DOES SO. IN SUCH A SITUATION, YOU SHOULD BE AWARE THAT FXCM MAY MAKE MORE MONEY IF THE MARKET GOES AGAINST YOU. ADDITIONALLY, SINCE FXCM ACTS AS THE BUYER OR SELLER IN THE TRANSACTION, YOU SHOULD CAREFULLY EVALUATE ANY TRADE RECOMMENDATIONS YOU RECEIVE FROM ANY OF FXCM'S REFERRING BROKERS. FXCM ITSELF DOES NOT PROVIDE INDIVIDUALIZED CLIENT TRADE RECOMMENDATIONS.



FXCM
LISTED
NYSE.

Forex Capital Markets, LLC
Financial Square
32 Old Slip 10th Floor
New York, NY 10005 USA
Tel. 212 897 7660
Fax. 212 897 7669
E-mail: admin@fxcm.com
www.fxcm.com

The information below must be completed in FULL.

## ACCOUNT APPLICATION

**Account Registration (Please check one only):**

☐ Individual Account
☐ Joint Account
☑ Corporate Account (Name; Revelation Forex Fund, LP

If Corporate, Tax ID # 45-2509042 )

**Account Type and Base Currency (please check one of each):**

☐ Standard Forex Account      ☐ EUR* ☐ GBP* ☐ USD ☐ JPY ☐ NZD* ☐ CAD*
☑ Active Trader;      ☑ USD
☐ Trading Station Gateway (TSG)      ☐ USD

*Platforms – account must be funded in the server currency only*

**IMPORTANT INFORMATION REGARDING PASSWORDS**
After successfully registering, you will receive a system generated temporary password.
Do not share your password with anyone as it provides access to trade on your account.

**Security Question:**
☐ What is your first pet's name?      ☐ What was the first street you lived on?
☐ What is your nickname?      ☑ What is your Mother's maiden name?

**Preferred Language:**
English

**Answer:**
Bauer

**Email Address:**

| k | w | h | i | t | e | @ | k | g | w | c | a | p | i | t | a | l | . | c | o | m | | | | | | | | | | | | | | |

Please complete your e-mail address clearly. This will be the primary method used to contact you.

## BASIC INFORMATION

This information must be completed for each participant in the account, individually, jointly, by all general partners and by the corporate officers authorized to make trading decisions for the account. Any party of a joint account may singly have full authority on the account, including but not limited to, trading rights and withdrawal rights. For the purpose of this document the term "Trader" always refers to the entity for which this application has been made, regardless of legal description. Please type or print clearly.

| 1 Primary Account Holder | | | Joint Account Holder | | |
|---|---|---|---|---|---|
| Last (Sur) Name: | First (Given) Name: | Middle Name. | Last (Sur) Name: | First (Given) Name: | Middle Name; |
| White | Kevin | Geoffrey | | | |

| Gender. ☑ Male ☐ Female | Gender. ☐ Male ☐ Female |
|---|---|
| Marital Status; ☑ Single ☐ Married | Marital Status: ☐ Single ☐ Married |

| 2 Passport, Driver's License or Social Security no. (Please attach a copy) Residents of the U.S. and U.S. territories MUST provide Social Security no. | Passport, Driver's License or Social Security no. (Please attach a copy) Residents of the U.S. and U.S. territories MUST provide Social Security no. |
|---|---|
| TDL 08366789 | |

| 3 Date of birth (MM/DD/YYYY) | Citizenship | Date of birth (MM/DD/YYYY) | Citizenship |
|---|---|---|---|
| 12/08/1959 | U.S. | | |
| If you are 65 years of age or older, please review the "High Risk Investment Notice" on p. 5 | | | |

**4 Joint Account Holder's relationship to the Primary Account Holder**

**5 Primary Account Holder's Home Address (Please attach proof of residence) (P.O. BOX may not be accepted)**

No. and Name of Street
2400 Dallas Parkway  Suite 540

| City | State | Postal/Zip Code | Country |
|---|---|---|---|
| Plano | Texas | 75093 | USA |

| Home Telephone no. | Home Fax no. | Mobile Phone no. |
|---|---|---|
| 214-676-2374 | 972-398-0013 | 214-676-2374 |

11



NewApp

**6  Joint Account Holder Home Address (Please attach proof of residence) (P.O. BOX may not be accepted)**

| No. and Name of Street | | | |
|---|---|---|---|
| | | | |

| City | State | Postal/Zip Code | Country |
|---|---|---|---|
| | | | |

| Home Telephone no. | Home Fax no. | Mobile Phone no. |
|---|---|---|
| | | |

**7  Primary Account Holder's Employment Details**  ☑ Employed  ☐ Self-employed  ☐ Retired
☐ Unemployed  (If unemployed, please review the "High Risk Investment Notice" on Page 5)

| Name of current employer (Required) | Nature of business (Required) | Position (Required) | Years with current employer |
|---|---|---|---|
| KGW Capital Management LLC | Investments | CEO | 7 |

| Business Address | Business Telephone no. |
|---|---|
| 2400 Dallas Parkway  Suite 540  Plano, TX  75093 | 972-398-0010 |

**8  Joint Account Holder's Employment Details**  ☐ Employed  ☐ Self-employed  ☐ Retired
☐ Unemployed  (If unemployed, please review the "High Risk Investment Notice" on Page 5)

| Name of current employer (Required) | Nature of business (Required) | Position (Required) | Years with current employer |
|---|---|---|---|
| | | | |

| Business Address | Business Telephone no. |
|---|---|
| | |

**9  Banking Information**
*If you intend on withdrawing funds via bank wire, you MUST complete the banking information section indicated below. All wire withdrawals will only go to the banking information on file.

| Bank Name | Bank Address |
|---|---|
| Community Trust Bank | 9456 Highway 121  Frisco, Texas  75035 |

| Bank Account Number | Bank Account Holder's Name – Beneficiary (Should be same as your name(s) appearing on this Application) |
|---|---|
| 20333535 | Revelation Forex Fund, LP |

| SWIFT Code or ABA Number | Person to Contact at Bank |
|---|---|
| 111102758 | Dawn Atencio |

**FINANCIAL INFORMATION (For Joint Account, please use combined financial information; For Corporate Accounts, please use the company's financial information)**

1. What is your total estimated annual income?
☐ Under $25,000  ☐ $25,000-$49,999  ☐ $50,000-$99,999
☐ $100,000-$249,999  ☐ $250,000-$1,000,000  ☑ Over $1,000,000
(If your annual income is less than $25,000, please review the "High Risk Investment Notice" on Page 5.)

2. Net worth (assets minus liabilities)?
☐ Under $25,000  ☐ $25,000-$49,999  ☐ $50,000-$99,999
☐ $100,000-$249,999  ☐ $250,000-$1,000,000  ☐ $1,000,000-$5,000,000
☐ $5,000,000-$10,000,000  ☑ Over $10,000,000
(If your net worth is less than $50,000, please review the "High Risk Investment Notice" on Page 5.)

3. Liquid assets (assets that can be quickly converted to cash)?
☐ Under $25,000  ☐ $25,000-$49,999  ☐ $50,000-$99,999
☐ $100,000-$249,999  ☑ $250,000-$1,000,000  ☐ Over $1,000,000

4. Have you declared bankruptcy in the last 10 years?  ☐ Yes  ☑ No
If Yes, please indicate date of discharge and provide copy of discharge letter.
_____

5. Will any person other than Trader control, manage, or direct the trading in this account?  ☐ Yes  ☑ No
If yes, please complete Limited Power of Attorney Form.

6. Do you have or have you ever had any other account(s) with FXCM?  ☐ Yes  ☑ No
If Yes, Account Number(s): _____

7. Are you or any person having interest in this account:
   1. A member of any commodity exchange?  ☐ Yes  ☑ No
   If Yes, Please List: _____
   2. An Associated person (AP) with any other CFTC or NFA registered firm?  ☐ Yes  ☑ No
   If Yes, Please List: _____
   3. An employee of a regulatory agency?  ☐ Yes  ☑ No
   If Yes, Please List: _____

8. Are you a relative of – or do you share the same home with – an officer, director, employee or associated person of FXCM?  ☐ Yes  ☑ No
   1. If yes, please describe the relationship _____

9. Are you a general partner, officer, director, owner of more than ten percent of the equity interest, associate person or employee of retail forex counterparty?  ☐ Yes  ☑ No

10. Are you a relative of or do you share the same home with a general partner, officer, director, owner of more than ten percent of the equity interest, associate person or employee of retail forex counterparty?  ☐ Yes  ☑ No
If yes, please describe the relationship _____

Please note that if you answered Yes to question number 9 or 10, you are required to provide written authorization from the related retail forex counterparty prior to opening an account with FXCM.

12

Forex Capital Markets – Account Application
11APR2011

30
**833**

| | | | | | |
|---|---|---|---|---|---|
| 1. | Do you have experience trading securities? | ☑Yes | ☐No | Years? | 25 |
| 2. | Do you have experience trading commodities? | ☑Yes | ☐No | Years? | 25 |
| 3. | Do you have experience trading futures? | ☑Yes | ☐No | Years? | 25 |
| 4. | Do you have experience trading currencies through interbank or OTC foreign exchange? | ☑Yes | ☐No | Years? | 10 |

If you do not have any prior trading experience, please review the "High Risk Investment Notice" on Page 5.

## SIGNATURE

PLEASE ACKNOWLEDGE YOUR AGREEMENT AND UNDERSTANDING OF EACH OF THESE SPECIFIC DISCLOSURES OF THE CLIENT AGREEMENT BY CHECKING THE APPROPRIATE BOX NEXT TO EACH DISCLOSURE TITLE.

| | | | Primary Account Holder | Joint Account Holder |
|---|---|---|---|---|
| 1. Risk Disclosure Statement | Pgs 7-8 | Required | ☑ | ☐ |
| 2. Notice to Traders | Pg 1 | Required | ☑ | ☐ |
| 3. Trader Agreement | Pg 2 | Required | ☑ | ☐ |
| 4. Consent to Jurisdiction and Venue (New York County, NY) | Pg 5 | Required | ☑ | ☐ |
| 5. FX Agreement | Pg 6 | Required | ☑ | ☐ |
| 6. Lending Agreement | Pg 5 | Required | ☑ | ☐ |
| 7. High Risk Investment | Pg 5 | Required | ☑ | ☐ |
| 8. Social Security or Tax ID certification & Backup Withholding Statement | Pg 5 | Required | ☑ | ☐ |
| 9. Authorization to Transfer Funds | Pg 5 | Required | ☑ | ☐ |
| 10. Consent to Electronic Transmission of Confirmations & Account Statements | Pg 6 | Required | ☑ | ☐ |
| 11. Arbitration Agreement | Pg 5 | Not Required | ☑ | ☐ |

## PROMOTIONAL CODE

If you have received a promotional code, please indicate the code in the space provided          Code _____

## REFERRAL

How did you hear about FXCM?

☐Referring Broker _____ (If by Referring Broker, please review "Referral Disclosure" on Page 2.)

☐Magazine    ☐Online Ad    ☐Friend    ☐Newspaper    ☐Seminar    ☐Search Engine

CUSTOMER INFORMATION. I hereby represent that the information provided by me on this packet is true and correct. I further represent that I will notify FXCM of any material changes in writing. FXCM reserves the right, but has no duty, to verify the accuracy of information provided, and to contact such bankers, brokers and others as it deems necessary.

THIS IS A CONTRACTUAL AGREEMENT. YOU WILL BE BOUND HEREBY. DO NOT SIGN UNTIL YOU HAVE READ ALL OF THE FOREGOING CAREFULLY.
I acknowledge that this Client Agreement is a legally binding contractual agreement. I have read the Client Agreement carefully, and by signing, I agree to be bound by every term and condition, including the items listed above (1-11). No modification of this Client Agreement is valid unless accepted by FXCM in writing. I confirm that I have received a full set of account documents and I have not made any alterations or deletions to this agreement or any such documents from the original forms. In the event that there are any alterations or deletions to this agreement such alteration and deletions shall not be binding on FXCM and said original forms shall govern Trader account relationship with FXCM.

| Primary Account Holder's Signature | Joint Account Holder's Signature |
|---|---|
| | |
| **Print Client Name** | **Print Client Name** |
| Revelation Forex Fund, LP | |
| Today's Date (MM/DD/YYYY): 07/06/2011 | Today's Date (MM/DD/YYYY): |

## IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT:

To aid the government's fight against the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. Therefore, we are required to obtain your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

PLEASE NOTE THAT ALL NON-U.S. APPLICATIONS MUST BE ACCOMPANIED BY:
1. A PHOTOCOPY OF YOUR PASSPORT OR DRIVER'S LICENSE OR OTHER GOVERNMENT ISSUED ID.
2. A PHOTOCOPY OF PROOF OF ADDRESS (i.e., A COPY OF UTILITY BILL OR BANK STATEMENT NO MORE THAN 6 MONTHS OLD)
    Upon processing of the account application, you will be contacted via E-mail.
    Please ensure the application is complete and legible to avoid errors or delays in processing.

FXCM does not charge applicants or clients for completing its applications or forms.

Important warning regarding fraudulent use of FXCM's website and trading platform.
Any person who, knowingly and with intent to defraud FXCM or its affiliates, submits an account application or other information containing any materially false information or conceals, for the purpose of misleading, information concerning any related fact material, commits a fraudulent act, which is a crime which may subject such person to criminal prosecution and the imposition of criminal and civil penalties.

If you intentionally provide us with any false or misleading information and we suspect fraud, we will communicate the facts surrounding your communication to us to all relevant national, state and local law enforcement authorities.

13

Forex Capital Markets — Account Application
11APR2011

31

**834**



FXCM
**LISTED**
NYSE.

Forex Capital Markets, LLC
Financial Square
32 Old Slip 10th Floor
New York, NY 10005 USA
Tel. 212 897 7660
Fax. 212 897 7669
E-mail: admin@fxcm.com
www.fxcm.com

## PARTNERSHIP RESOLUTION

I, RFF GP, LLC , a General Partner of Revelation Forex Fund, LP , a partnership formed under the laws of the State of Texas (the "Partnership"), do hereby certify that the following resolutions were, or hereby are, duly adopted in accordance with the procedures set forth in the governing instruments of the Partnership and that said resolutions have not been amended, rescinded or revoked, and are in no way in conflict with any of the provisions of the governing instruments of the Partnership.

Partnership Name: Revelation Forex Fund, LP

Address: 2400 Dallas Parkway Suite 540 City Plano

State: Texas Postal Code 75093 Country USA

Partnership Nature of Business: Currency Hedge Fund

Does your business structure meet the criteria of a financial institution?* Yes ☑ No ☐

*The term Financial Institution applies to but is not limited to a bank, credit or thrift institution, broker dealer, investment company, currency exchange, mortgage broker, insurance company, futures commission merchant, commodity pool operator, mutual fund, a licensed sender of money or any other person who engages as a business in the transmission of funds. The term Financial Institution also includes individuals who are engaged in collecting or pooling funds on the behalf of others.

## RESOLUTION

(1) Resolved that: Insert names of all General Partners: RFF GP, LLC

Each of them or such other person as this Partnership may designate from time to time either in writing or by their apparent authority be and hereby are authorized to trade Spot foreign currency for the account for risk of this Partnership through and with FXCM, as said firm is now constituted or may be hereafter constituted, the authority hereby granted including the power to do any of the following:

(a) To open an account with FXCM for the purpose of FXCM's carrying, clearing, and settling all foreign currency transactions undertaken by the Partnership;

(b) To buy and sell foreign currency positions for present delivery, on margin or otherwise, the power to sell including the power to sell "short";

(c) To deposit with and withdraw from said firm money for the purchase or sale of foreign currency and other property;

(d) To receive requests and demands for additional margin, notices of intention to sell or purchase and other notices and demands of whatever character;

(e) To receive and confirm the correctness of notices, confirmations, requests, demands and confirmations of every kind;

(f) To place oral orders with any authorized representative of FXCM for the execution of foreign currency transactions on behalf of the Partnership on any marketplace FXCM is permitted to effect transaction on;

(g) To pay FXCM all fees, commissions and mark ups or downs incurred in connection with any such transactions and all amounts as may be requested by FXCM form time to time as margin or equity for the Partnership's account;

(h) To settle, compromise, adjust and give releases on behalf of this Partnership with respect to any and all claims, disputes and controversies;

(i) To otherwise perform all terms and provisions of the above mentioned Agreements, and to take any other action relating to any of the foregoing matter;

(2) Let it be further resolved that it is in the best interest of the Partnership to have its account(s) for the purchase and/or sale of foreign currencies cleared and carried by FXCM and for FXCM to arrange for the execution of foreign currencies transactions which are not executed by the Partnership directly;

(3) Resolve that FXCM may deal with any and all of the persons directly or indirectly by the foregoing resolution empowered, as though they were dealing with the Partnership directly, and that in the event of any change in the office or powers or persons hereby empowered, the above-names representatives shall certify such change to FXCM in writing in the manner herein above provided, which notification, when received, shall be adequate both to terminate the powers of the persons theretofore authorized, and to empower the persons substituted;

(4) Further Resolved, that in order to induce FXCM to act as Agent on behalf of the Partnership, the execution and delivery of an Account Application, Client Account Letter, Client Agreement, Risk Disclosure Statement, and other documents appropriate to induce FXCM to act as Agent, (copies of which have been presented to this meeting and will be filed with the records of the Partnership) by any officer of the Partnership are hereby authorized; and the officers of the Partnership are hereby directed to execute such Agreements by and on behalf of the Partnership and to deliver the same to FXCM;

(5) Further Resolved, that the foregoing resolutions and the certificate actually furnished to FXCM by the above-names representatives of the Partnership pursuant thereto, be and they hereby are made irrevocable until written notice of the revocation thereof shall have been received by FXCM.

(6) Further Resolved, that the Partnership agrees to indemnify and hold harmless FXCM and its associates from any and all loss, damage or liability incurred because of any of the representations or warranties made above shall not be true and correct or any of the agreements entered into between the Partnership and FXCM shall not have been fully performed by the Partnership;

(7) Further Resolved, that the above-named representatives be and hereby are authorized and directed to present a certified copy of these resolutions, together with a certification as to the incumbency of certain officers to FXCM and that the authority hereby given to the Agents (including the persons named as officers in such certification until such time as FXCM receives written notification that such persons are no longer such officers) shall continue in full force and effect (irrespective of whether any of them ceases to be officers or employees of the Partnership) until notice of revocation or modification is given in writing to FXCM or its successors or assigns.

I further certify that the foregoing resolutions have not been modified or rescinded and are now in full force and effect and that the Partnership has the power under its governing instruments to take the action set forth in and contemplated by the foregoing resolutions.

I do further certify that each of the following has been duly elected and is now legally holding the office set opposite his/her signature.

_____  Managing Principal of RFF GP, LLC
Name and Signature of General Partner (or managing partner)

_____
Name and Signature of General Partner (or managing partner)

_____
Name and Signature of General Partner (or managing partner)

07/06/2011
Today's Date (MM/DD/YYYY)

## PERSONAL GUARANTY

This Guaranty is made by the undersigned ("Guarantor"), in favor of FXCM in order to induce FXCM to enter into a Client Agreement between FXCM and

_____, a Partnership organized under the laws of _____, ("Client").

In consideration of the opening of the above-referenced account for Client, FXCM must have a personal guarantee in order to enter into Client Agreement with Client. For this account the undersigned agrees to jointly and severally guarantee personally the prompt, full and complete performance of any and all of the duties and obligations of this Client's account and the payment of any and all damages, costs and expenses, which may become recoverable by FXCM from Client.

This guarantee shall remain in full force and effect until the termination of the Client Agreement, provided that the undersigned shall not be released from their obligations so long as the account and any obligations the account has with FXCM lasts.

This Guaranty shall be governed by, enforced and construed in accordance with the laws of the State of New York and Guarantor hereby expressly submits to the jurisdiction of all federal and state courts located in New York County, New York for purposes of any action or proceeding involving this Guaranty, and consents that any process or notice of motion or other application to any of said courts or to any judge thereof may be served within or without any such court's jurisdiction by registered or certified mail or by personal service.

This Guaranty shall inure to the benefit of and be enforceable by FXCM and its successors and assigns, and shall be binding upon and enforceable against Guarantor and its successors and permitted assigns, provided, however, that this Guaranty may not be assigned by Guarantor to any other party without the prior written consent of FXCM and further provided that any such assignment by Guarantor, as consented by FXCM, shall not release Guarantor from its obligations hereunder.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed as of the _____ day of _____ 20____.

Signature: _____

Print Name: _____

SS Number: _____

Home Address: _____

For Partnership Accounts ONLY:

In addition to the Client Agreement to be completed by the General Partner, please be sure to submit the following:

(1)    Partnership Agreement (if limited partnership, submit copy of Limited Partnership Agreement and Certificate of Limited Partnership)
(2)    Identification for all Signing Partners (i.e., copy of passport or driver's license.); and
(3)    Proof of address for the signing members (i.e., a copy of an updated utility bill or bank statement no more than six months old)



In an effort to better understand your business model and to assist FXCM in making the required customer screening process smoother, we ask that you complete the following questionnaire regarding your company's business structure. Should you have questions regarding any of the content below, please contact compliance@fxcm.com and we will be happy to assist you further. Thank you in advance for your cooperation.

1. Please provide a general description of your company's business model, including the targeted customer base (e.g., investment firms, individuals, etc.) and the products/services that your institution offers.

> Revelation Forex Fund, LP (the Company) is a highly specialized hedge fund that utilizes a statistical arbitrage strategy to capture short and medium term variances between global exchange rates while remaining market neutral. Our target customers include accredited individual investors and institutions.

2. Will deposited funds held with FXCM be proprietary funds of the institution or will any portion of the funds originate from third parties (i.e., investors, members, and/or shareholders)? Please outline the origin of the funds which will be traded at FXCM.

> Investor funds will be deposited into the Company's bank account then the Company will place those funds into the FXCM account.

3. Where does the institution maintain physical offices?

> 2400 Dallas Parkway  Suite 540
> Plano, Texas  75093

4. Please provide an understanding of your institution's ownership structure (public vs. private), a listing of all owners with 25% or greater interest, and the management structure including the physical location of the managers.

> The Company is wholly owned by RFF GP, LLC which is managed and wholly owned by Kevin G. White.

any other government authority? (Examples include the central bank, jurisdictional regulators and any other independent associations.)

> No

6. Please confirm if your company clears for other institutions allowing other institutions to conduct business and provide services to their clients through your institution without the expense of a physical presence?

> No, we do not.

7. If the institution has a designated Compliance and Anti Money laundering officer that is not completing this questionnaire, please provide the name and contact information below.

| | |
|---|---|
| Company Name: Revelation Forex Fund, LP | |
| Name: Kevin G. White | |
| Title: Managing Principal of RFF GP, LLC the General Partner | |
| Signature: | |
| Date: 7/6/2011 | |
| E-mail Address: kwhite@kgwcapital.com | |

# Tab B

CAUSE NO. 429-00075-2014

| | | |
|---|---|---|
| KELLY M. CRAWFORD, Receiver, as Assignee, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | 429th JUDICIAL DISTRICT |
| WEAVER & TIDWELL, L.L.P., KEVIN A. SANFORD, SARAH ROBERTS, BRIAN HINMAN, and FOREX CAPITAL MARKETS, LLC, | § § § § § § | |
| Defendants. | § | COLLIN COUNTY, TEXAS |

## ORDER ON VARIOUS MOTIONS

On the 6th day of March, 2014, Defendants came on to be heard on various Motions. After hearing the arguments of counsel, the Court issues the following rulings:

Defendant Forex Capital Markets, L.L.C.'s Motion to Dismiss for Improper Venue and Lack of Jurisdiction are DENIED.

Defendant Forex Capital Markets, L.L.C.'s Motion to Compel Arbitration is DENIED.

Defendant Weaver & Tidwell, L.L.P.'s Plea to the Jurisdiction and Plea in Abatement are DENIED.

~~Plaintiff Kelly M. Crawford's Objection to Defendant Forex Capital Markets, L.L.C.'s Motion to Designated Responsible Third Parties is SUSTAINED. Defendant~~

---

ORDER ON VARIOUS MOTIONS

~~Forex Capital Markets, L.L.C. is granted thirty (30) days to replead in accordance with~~
~~the notice pleading standard with respect to each third party for whom it wishes to~~
~~apportion responsibility in this case.~~

Signed this ___7th___ day of March, 2014.

_____
HON/JUDGE JILL WILLIS

# Tab C

**AFFIRM; and Opinion Filed December 31, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-00341-CV

**FOREX CAPITAL MARKETS, LLC, Appellant**

**V.**

**KELLY M. CRAWFORD, Appellee**

**On Appeal from the 429th Judicial District Court
Collin County, Texas
Trial Court Cause No. 429-00075-2014**

## MEMORANDUM OPINION

Before Justices O'Neill, Lang-Miers, and Brown
Opinion by Justice O'Neill

In this consolidated interlocutory appeal and petition for writ of mandamus, appellant Forex Capital Markets, LLC (FXCM) complains of the trial court's order denying its motion to dismiss for improper venue or, in the alternative, motion to compel arbitration. *In re Lisa Laser USA, Inc*., 310 S.W.3d 880, 883 (Tex. 2010) (mandamus relief is available to enforce an unambiguous forum-selection clause); TEX. CIV. PRAC. & REM. CODE ANN. §§ 51.016, 171.098(a)(1) (West 2011) (authorizing interlocutory appeals from denial of motion to compel arbitration). In both proceedings, FXCM asserts the trial court erred in not enforcing provisions of a contract entered into between it and a limited partnership against the federal equity receiver of that partnership. For the following reasons, we affirm the trial court's order and deny the petition for writ of mandamus.

Kevin G. White induced investors to contribute millions of dollars in funds to invest in Revelation Forex Fund, LP (Revelation) to engage in foreign currency exchange ("Forex") trading. To conduct that trading, Revelation opened a "Forex" account with FXCM. When it did so, Revelation agreed to provisions in a "Client Agreement," which included a forum selection clause consenting to jurisdiction and exclusive venue in New York and an agreement to arbitrate. White subsequently misappropriated over $1 million in partnership funds. The investors also suffered significant losses from Revelation's trading activities.

The Security and Exchange Commission (SEC) and the Commodity Futures Trading Commission (CFTC) instituted civil enforcement actions in federal court against White, Revelation, and other entities White controlled alleging White defrauded Revelation's investors.[1] The federal court appointed appellee Kelly M. Crawford as receiver over the "estates and assets" of White, Revelation, and related entities. The federal court gave Crawford broad powers, including all powers, authority and rights that the officers, directors and partners had possessed, as well as all powers and authority of a receiver at equity. The federal court also directed Crawford to investigate the business affairs of the entities and, after obtaining leave of court, to file such actions as he deemed appropriate.

Crawford subsequently determined that Revelation's investors had claims against FXCM for its participation and complicity in White's scheme. The investors unconditionally assigned their claims against FXCM to Crawford and agreed that any recovery would be included in the "Receivership Estate." The federal court then expressly authorized Crawford to file suit against FXCM on the assigned claims.

_____

[1] White pleaded guilty to committing wire fraud in connection with the fraudulent scheme.

Crawford then filed this suit, in his own name, but as the assignee of the investors' claims.[2]  FXCM filed a motion to dismiss for improper venue or, in the alternative, motion to compel arbitration.  It relied on the forum selection clause and arbitration agreement in Revelation's Client Agreement.  The trial court denied FXCM's motions.

According to FXCM, the trial court erred in doing so because, as Revelation's receiver, Crawford is bound by its agreements regarding venue and arbitration.  Crawford, on the other hand, responds Revelation's agreements are inapplicable because he has sued only on claims that the investors assigned to him for injuries they suffered as a result of FXCM's conduct.

It is well settled that when a claim is assigned, the assignee "steps into the shoes of the assignor and is considered under the law to have suffered the same injury as the assignors and have the same ability to pursue the claims." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc*., 308 S.W.3d 909, 916 (Tex. 2010).  An assignee may thus assert those rights that the assignor could assert, including bringing suit. *Flagstar Bank, FSB v. Walker*, 05-13-00724-CV, 2014 WL 6065713 (Tex. App.—Dallas Nov. 14, 2014, no pet. h.); *Cadle Co. v. Estate of Weaver*, 897 S.W.2d 814, 818 (Tex. App.—Dallas 1994, writ denied); *see also Jackson v. Thweatt*, 883 S.W.2d 171, 174 (Tex. 1994).  An assignee's rights are also subject to defenses existing at the time of the assignment that would have been available against the assignor had there been no assignment. *See Irrigation Ass'n v. First Nat'l Bank of Frisco*, 773 S.W.2d 346, 348 (Tex. App.—Dallas 1989, writ denied).

Absent an agreement to the contrary, a plaintiff generally has the right to have their claims resolved by litigation and to choose the venue in which to file suit. *See In re Fisher*, 433 S.W.3d 523, 533 (Tex. 2014) (plaintiff is generally afforded the right to choose venue when suit

---

[2] Throughout, we use the phrase "investors'" claims to reference claims asserting the legal rights of the investors, not to identify the party with title or ownership of the claims.

is filed); *Freis v. Canales*, 877 S.W.2d 283, 284 (Tex. 1994) (party who has not agreed to arbitration has a right to have disputes resolved by litigation). A party seeking to enforce a forum selection clause or an arbitration agreement must first show the existence of the agreement and that the claims fall within the scope of that agreement. *See In re D. Wilson Constr. Co*., 196 S.W.3d 774, 781 (Tex.2006) (orig. proceeding); *Seven Hills Commercial, LLC v. Mirabal Custom Homes, Inc*., 442 S.W.3d 706, 715 (Tex. App.—Dallas 2014, pet. filed); *Young v. Valt.X Holdings, Inc*., 336 S.W.3d 258, 262 (Tex. App. —Austin 2010, pet. dism'd ).

This initial burden includes showing the contract applies to the parties involved in the dispute. *See VSR Fin. Servs., Inc. v. McLendon*, 409 S.W.3d 817, 827 (Tex. App.— Dallas 2013, no pet.). A party may meet this burden by showing the party signed the contract or is otherwise bound to the contract under principals of contract law and agency. *See In re Kellogg, Brown & Root Inc.*, 166 S.W.3d 732, 738 (Tex. 2005); *CNOOC SE Asia Ltd. v. Paladin Resources (SUNDA) Ltd*., 222 S.W.3d 889, 894-95 (Tex. App.—Dallas 2007, pet. denied); *Mohamed v. Auto Nation USA Corp.*, 89 S.W.3d 830, 835-36 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

Here, Crawford filed suit against FXCM on claims the investors' unconditionally assigned to him. FXCM does not challenge the validity of the assignments. As a consequence, Crawford stands in the investors shoes. But to support its motion, FXCM did not show the investors agreed to either venue in New York or to arbitration. Nor did FXCM show the investors were otherwise bound under any theory of agency or contract law.[3] Instead, it asserts Crawford was bound by Revelation's agreements because the investors' claims are now "property of the receivership estate" and Crawford, as receiver, "represents" the "estate" and is

---

[3] In its reply brief, FXCM asserts for the first time the investors were bound by the provisions in the Client Agreement. It relies on two agreements it asserts shows the investors authorized Revelation to execute the Client Agreement. But because FXCM raised this issue for the first time in its reply brief, we cannot consider it as grounds for reversal. *Cebcor Serv. Corp. v. Landscape Design & Const., Inc*., 270 S.W.3d 328, 334 (Tex. App.—Dallas 2008, no pet.) (party may not raise an issue for the first time in reply brief). Moreover, the only agreements FXCM directs us to are copies of a limited partnership agreement and a subscription agreement Revelation attached to its "Public Offering Memorandum." Neither agreement is signed by any investor. Further, FXCM has cited us to no authority and has provided no legal analysis showing these agreements are sufficient to bind the investors to the provisions in the Client Agreement. *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.) (failure to cite applicable authority or provide substantive analysis waives an issue on appeal).

thus bound by any agreements of the "estate." Of course, the "estate" did not execute the agreement FXCM relies on, only Revelation did.[4] Nevertheless, FXCM asserts Crawford is bound by the agreement because of the limitations on a receiver's standing to bring claims to benefit investors.

As a general rule, a receiver may sue only for claims of the entities in receivership, and may not assert claims for injuries directly suffered by the investors. *See Liberte Capital Grp., LLC v. Capwill*, 248 F. App'x 650, 655 (6th Cir. 2007); *Scholes v. Schroeder*, 744 F.Supp. 1419, 1421 (N.D.Ill.1990); *see also Cotton v. Republic Nat'l Bank of Dallas*, 395 S.W.2d 930, 941 (Tex. Civ. App.—Dallas 1965, writ ref'd n.r.e.); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 190 (5th Cir. 2013); *Javitch v. First Union Secs., Inc.* 315 F.3d 619, 625 (6th Cir. 2003); *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966 (5th. Cir. 2012). These third-party claims are personal to the investor, and they alone may bring them. *See Cotton*, 395 S.W.2d at 941.

When a receiver sues for the entity's claims, the receiver generally stands in the shoes of that entity, possessing no greater rights than the entity had and subject to any agreements the entity entered.[5] *Javitch,* 315 F.3d at 625; c*f. Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153-54 (3d Cir.1989) (when bankruptcy trustee asserts claims derivative of debtor's rights, he is subject to debtor's agreement to arbitrate). A receiver is

---

[4] Crawford agrees that any recovery he might obtain on the claims would become property of the estate, but he does not concede the claims themselves are receivership property. That issue is not pertinent to our resolution of this appeal.

We also note that a receiver is an officer of the court, not a representative of the parties. *See Sec. Trust Co. of Austin v. Lipscomb County*, 142 Tex. 572, 584, 180 S.W.2d 151, 158 (1944). "He is a disinterested party, the representative and protector of the interests of all persons, including creditors, shareholders and others, in the property in receivership." *Id.* (citing Clark on Receivers, 2d Ed., Vol. 1, pp. 33-37, ss 34-38, p. 43, s 45; 45 Am.Jur. pp. 106-111, ss 126-130.)

[5] Even so, when a receiver brings claims of a receivership entity, he does not necessarily stand in the entity's shoes for all purposes. *F.D.I.C. v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995) (while receiver generally occupies the same position as the entity he represents, certain defenses based on the entity's unclean hands or inequitable conduct do not generally apply against the entity's receiver); *see also Scholes*, 56 F.3d at 753–55 (the defense of in pari delicto does not apply to receiver even if it would apply to entity); *Jones,* 666 F.3d at 966.

therefore bound to a receivership entity's agreement to arbitrate if the entity would have been subject to that agreement.[6] *See Javitch*, 315 F.3d at 627.

Here, however, Crawford is not asserting standing based on his capacity as receiver, but on the investors' unconditional assignments. *Cf. Oakes v. Lake*, 290 U.S. 59, 62-63 (1933) (holding limitations generally applicable to a foreign receiver's authority to bring claims outside his jurisdiction do not apply when receiver brings claims based on assignments). FXCM does not challenge the validity of the assignments or indeed contest that Crawford had standing to bring the claims. *Vt. Agency of Nat. Resources & U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000) ("an assignee of a claim has standing to assert the injury in fact suffered by the assignor"); *see also in re Bogdan*, 414 F.3d 507, 512 (4th Cir. 2005) (unconditional assignments gave bankruptcy trustee standing to prosecute creditors' claims). Indeed, if Crawford lacked standing, FXCM's remedy would not be enforcement of Revelation's contract against him, but dismissal of the claims for want of jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Finally, we cannot agree with FXCM to the extent it suggest that the capacity in which Crawford brought the assigned claims dictates the rights and remedies applicable to those claims. Instead, under well-settled principals that govern assignments, Crawford acquired all the rights the investors' had, including the right to bring this suit in Texas state court.

---

[6] However, the receiver is not necessarily bound to such agreements when brining claims of other parties. *See Javitch*, 315 F.3d at 627 n. 7.

Therefore, we affirm the trial court's order denying FXCM's motion to compel arbitration and deny its petition for writ of mandamus.


/Michael J. O'Neill/
_____
MICHAEL J. O'NEILL
JUSTICE

140341F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

FOREX CAPITAL MARKETS, LLC,
Appellant

No. 05-14-00341-CV     V.

KELLY M. CRAWFORD, Appellee

On Appeal from the 429th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 429-00075-2014.
Opinion delivered by Justice O'Neill.
Justices Lang-Miers and Brown
participating.

In accordance with this Court's opinion of this date, we **AFFIRM** the trial court's order denying appellant Forex Capital Markets, LLC motion to compel arbitration.

We **ORDER** appellee KELLY M. CRAWFORD recover his costs of this appeal from appellant FOREX CAPITAL MARKETS, LLC.

Judgment entered this 31st day of December, 2014.

**Order entered December 31, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-00341-CV

### IN RE FOREX CAPITAL MARKETS, LLC, Relator

### V.

### KELLY M. CRAWFORD, Appellee

**On Appeal from the 429th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-00075-2014**

## ORDER

In accordance with this Court's opinion of this date, we **DENY** Relator Forex Capital Markets, LLC's petition for writ of mandamus.

We **ORDER** real party in interest Kelly M. Crawford recover his costs of this proceeding from relator Forex Capital Markets.

/Michael J. O'Neill/
MICHAEL J. O'NEILL
JUSTICE

# Tab D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,    §<br>§<br>§<br>Plaintiff,    §<br>§<br>v.    §<br>§<br>KEVIN G. WHITE,    §<br>KGW CAPITAL MANAGEMENT, LLC,    §<br>REVELATION FOREX FUND, L.P., and    §<br>RFF GP, LP,    §<br>§<br>Defendants,    §<br>§<br>MERIDIAN PROPANE, L.P., and    §<br>W CORPORATE REAL ESTATE, LP d/b/a    §<br>KGW REAL ESTATE,    §<br>§<br>Relief Defendants.    §<br>§ | CIVIL ACTION NO.<br>4:13-CV-0383 |

**RECEIVER'S SECOND QUARTERLY STATUS REPORT**

Kelly M. Crawford, as the court-appointed Receiver, submits the following second quarterly status report pursuant to this Court's *Order Appointing Receiver* (the "*Receivership Order*").[1]

The *Receivership Order* directs the Receiver to submit quarterly status reports within thirty (30) days after the end of each calendar quarter reflecting to the best of the Receiver's knowledge as of the period covered by the report the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estate. More specifically, paragraph 51 of the *Receivership Order* states:

---

[1] The Receiver requests the Court to take judicial notice of the pleadings on file in this lawsuit.

1

"The Quarterly Status Report shall contain the following:

A.  Summary of the operations of the Receiver;

B.  The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.  A schedule of all the Receiver's receipts and disbursements (attached as <u>Exhibit A</u> to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D.  A descriptions of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.  A description of liquidated and unliquidated claims held by each Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in; (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.  A list of all known creditors with their addresses and the amounts of their claims;

G.  The status of Creditor Claims Proceedings, after such proceedings have been commenced; and

H.  The Receiver's recommendations for a continuation of the receivership and the reasons for the recommendations."

2

On September 25, 2013, the Receiver filed his initial Quarterly Status Report [Docket No. 46] based upon the period from the inception of the receivership on July 10, 2013 through September 25, 2013.   This Second Quarterly Status Report incorporates the information contained in the initial Quarterly Status Report, and is based upon the period from September 26, 2013 through December 31, 2013.

## I.

## SUMMARY OF THE OPERATIONS OF THE RECEIVER AND DESCRIPTION OF KNOWN RECEIVERSHIP PROPERTY AND CLAIMS HELD BY THE RECEIVERSHIP ESTATE

During the period covered by this Second Quarterly Status Report, the Receiver continued to identify assets subject to the receivership, continued to liquidate receivership assets, investigated and developed claims held by the Receivership Estate, and settled numerous claims for the benefit of the Receivership Estate.

On October 16, 2013, the Receiver and his counsel interviewed Defendant Kevin White at the office of Mr. White's counsel.  Mr. White cooperated in the interview and the information Mr. White shared with the Receiver helped the Receiver identify additional assets to recover and assisted in the investigation of claims against third parties.

### A.  IDENTIFICATION OF ADDITIONAL RECEIVERSHIP PROPERTY

Based on the Receiver's interview with Mr. White, the Receiver discovered that a display booth purchased with investor funds was being stored with the manufacturer of the booth in Carrollton, Texas.   Through the forensic accounting conducted by the Receiver's accounting firm, the Receiver traced at least $40,000 of investor funds to The Trade Group, a company in Carrollton, Texas that manufactures display booths for promotional events.  Defendant White had a display booth custom built to promote the Revelation Forex Fund and paid The Trade

3

Group $40,000 for the booth. After the booth was used by Defendant White, it was returned to The Trade Group for storage. The Receiver confirmed the display booth was at The Trade Group and the Receiver negotiated the sale of the display booth to an independent third party for $6,000. From these sales proceeds, the Receiver paid The Trade Group $1,380 for the cost of storing the display booth for several months.

## B. SETTLEMENT OF FRAUDULENT TRANSFER CLAIMS

As reported in the Receiver's initial Quarterly Status Report, the Receiver determined that he had fraudulent conveyance claims against the family members of Defendant Kevin White, and those persons who worked in the KGW Capital office with Defendant White. The Receiver made demand upon them and they denied any liability to the receivership. During the period covered by this Second Quarterly Status Report the Receiver successfully negotiated settlements with each of the persons the Receiver alleged were recipients of fraudulent transfers, and such settlements were approved by the Court.

With respect to the White family, the Receiver recovered from the daughter of Defendant Kevin White approximately $7,000 from monies remaining in an account in the daughter's name; a 2009 Chevrolet Tahoe being driven by the daughter; and a Sig Sauer hand gun given by Defendant White to his daughter. The Receiver recovered from the son of Defendant White a negligible sum ($13.00) remaining in a bank account in the son's name; and a shot gun given by Defendant White to his son. A 2010 Toyota Tundra being driven by White's son had no equity and was repossessed by the lender. The Receiver also obtained a release from Defendant White's ex-wife of her claims against the receivership estate arising out of her divorce decree.

The Receiver also negotiated settlements with each of the persons who worked with Defendant White in the KGW Capital Office, as follows:

4

Steve McCraw is paying $71,000 over the next several months[2];

Cody Savage paid $42,100;

Christine Xu paid $10,000; and

Jill Waterston paid $2,500.

The settlement of these claims totaling $125,600, without the expense of protracted litigation, will benefit the Receivership Estate and ultimately the approved claimants who are the beneficiaries of the Receivership Estate.

## C. CONTINUED LIQUIDATION OF RECEIVERSHIP ASSETS

During the period covered by this Second Quarterly Status Report, the Receiver sold the following receivership assets:

1. Sculpture of horses for $770

2. Trade Display (as discussed above) for $6,000

3. Guns for $2,600

4. 2009 Chevrolet Tahoe for $25,000

5. Miscellaneous personal property left over from the auction and fishing lures for $166.

The Receiver is still seeking buyers for the following receivership assets:

1. 2008 Mercedes Benz S550 for sale for $32,000

2. 2002 Rolex Yacht Master watch for sale for $6,000

3. One shotgun and one Sig Sauer handgun, which the Receiver is seeking to sell for approximately $700.

---

[2] To date Mr. McCraw has paid $40,000.

## D. DEVELOPMENT OF CLAIMS HELD BY RECEIVERSHIP ESTATE

The Receiver continued investigating the role of other persons and entities, including professionals, involved with KGW Capital, the Revelation Forex Fund, the solicitation of investors in the fund, and/or the trading of the fund. The Receiver made demand upon Weaver & Tidwell and the individual accountants who prepared the performance report of the account managed by Brian Hinman that was used by Defendant White. In addition, the Receiver made demand upon Sean Hyman whom the Receiver contends endorsed the Revelation Forex Fund for a period of time.

In furtherance of the Receiver's investigation, on November 20, 2013 the Receiver's counsel took the deposition of Brian Hinman, the person who traded the Revelation Forex Fund and who was employed by FXCM. At the deposition Mr. Hinman invoked his 5th amendment privilege in response to most of the questions. On December 30, 2013 the Receiver and his counsel met in Chicago, Illinois with James Bibbings, a former auditor for the National Futures Association, to determine the standards of the industry that should have been followed by FXCM in dealing with Defendant White, KGW Capital, and the Revelation Forex Fund. The Receiver recently made demand upon FXCM for the production of additional documents.

The Receiver also made demand upon Doug Conder (the CPA who prepared the K-1's issued to the investors) to pay to the receivership a sum equal to the cost to amend the tax returns, and reissue the K-1's

The Receiver received assignments of the claims against third parties from each of the investors in the Revelation Forex Fund. The Receiver proposed to the Court as part of the Receiver's liquidation plan that these claims against third parties be pursued on a reduced contingent fee basis.

## II.

## AMOUNT OF CASH ON HAND AND ACCRUED ADMINISTRATIVE EXPENSES

As reported in the Receiver's First Quarterly Status Report, to administer the receipt and disposition of monies in the receivership, the Receiver opened receivership accounts at JP Morgan Chase and at Legacy Bank.   The current balance of the Legacy Bank Account is $28,535.91.  Legacy Bank originally claimed a right of offset to these monies based upon a loan Legacy Bank had made to a receivership entity that is in default, but Legacy Bank, despite having actual notice of the need to file a creditor claim in the receivership, failed to file a claim in the receivership and does not hold an approved claim in the receivership.  Accordingly, the Receiver contends such monies are available to the receivership.   The current balance held in the receivership account at Chase is $3,256,526.16.   The Receiver also has $40 cash on hand received from the sale of fishing lures that remains to be deposited into the receivership account.

The accrued and unpaid administrative expenses from the inception of the receivership through December 25, 2013 that have not been paid are approximately as follows:  $37,965 in Receiver's fees; $65,705.50 in Receiver's attorney's fees; $10,761.43 in expenses incurred; and $5,509.10 in Receiver's accounting fees and expenses.  In addition, a check payable to Platinum Storage in the amount of $147 has not yet cleared the bank.  As a result, the current balance of unencumbered funds in the receivership account at Chase is approximately $3,136,438.10[3].  A schedule of the Receiver's receipts and disbursements since the Receiver's First Quarterly Report is attached hereto as **Exhibit A.**   A schedule of the Receiver's total receipts and disbursements from the inception of the receivership through January 3, 2014 is attached hereto as **Exhibit B.**

---

[3] This balance is based upon the cash on hand as of January 3, 2014, and administrative expenses incurred as of December 25, 2013.

## III.

## THE STATUS OF CLAIMS PROCEEDINGS FOR INVESTORS AND CREDITORS

On October 9, 2013, the Receiver filed with the Court the Receiver's Proposed Liquidation and Distribution Plan and established a procedure for investors and creditors to submit claims to the Receiver; for the Receiver to make his recommendations regarding the claims; and an opportunity for the investors and creditors to object to the Receiver's recommendations.

On October 30, 2013, the Receiver filed his Report Regarding the Responses of Investors and Creditors to the Receiver's Proposed Liquidation and Distribution Plan. This Report included a list of the claims filed by the investors and creditors as well as the Receiver's recommendations regarding the claims. As set forth in the Receiver's Report, no investors or creditors objected to the Receiver's Proposed Liquidation Plan. One creditor, First Community Bank, objected to the Receiver's Distribution Plan, which proposes to pay investors before paying creditors. First Community Bank objected to the Receiver's proposal and argues that creditors should be paid ahead of investors, or equally. No other objections were filed by any investor or creditor.

On November 6, 2013, the Receiver filed a motion with the Court requesting a hearing on the Receiver's Liquidation and Distribution Plan. The Court granted that motion and conducted a hearing on December 5, 2013. To date the Court has not ruled upon the objection or the proposed Liquidation and Distribution Plan. Once the Court issues its ruling the Receiver intends to request the Court to authorize the Receiver to make an interim distribution to the approved claimants.

## IV.

## RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP

This is the second report from the Receiver and significant work remains for the Receiver to do in this case, including selling the few remaining assets, recovering damages from third parties as discussed herein, administering the investor and creditor claims, and making distributions pursuant to a distribution plan to be approved by the Court. Accordingly, the Receiver recommends the receivership continue.

Respectfully submitted January 6, 2014.

**RECEIVER KELLY M. CRAWFORD**

*/s/ Kelly M. Crawford*
Kelly M. Crawford, Receiver
State Bar No. 05030700
500 North Akard Street, Suite 2700
Dallas, Texas 75201
(214) 706-4200 – Telephone
(214) 706-4242 – Telecopier

9

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 6, 2014 I electronically filed the foregoing document with the clerk of the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record:

Janie L. Frank
Texas Bar No. 07363050
Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry St., Unit #18
Fort Worth, TX 76102-6882
frankj@sec.gov

B. David Fraser
Texas Bar No. 24012654
Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX  76102-6882
fraserb@sec.gov
*Counsel for Plaintiff*

Meridian Propane LP
5645 Hillsborough Drive
Plano, Texas 75093
*Relief Defendant*

Edwin Tomko
Jason Ross
Dykema Gossett, PLLC
1717 Main St., Suite 4000
Dallas, TX 75201
*Counsel for Kevin G. White, KGW Capital Management, LLC, Revelation Forex Fund, LP, RFF GP, LP and W Corporate Real Estate, LP d/b/a KGW Real Estate*

/s/ Kelly M. Crawford
KELLY M. CRAWFORD

10

# Tab E

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | § § § § | |
| Plaintiff, | § § | Civil Action No. |
| vs. | § § | 4:13-cv-382 |
| RFF GP, LLC, KGW CAPITAL MANAGEMENT, LLC, and KEVIN G. WHITE, | § § § § § | |
| Defendants, | § § | |
| REVELATION FOREX FUND, LP, MERIDIAN PROPANE LP, and W CORPORATE REAL ESTATE, LP d/b/a KGW REAL ESTATE | § § § § § § | |

## SECOND STATUS REPORT OF THE RECEIVER

Kelly M. Crawford, as the court-appointed Receiver, submits the following second status report pursuant to this Court's *Order Granting Plaintiff's Ex Parte Emergency Motion for a Statutory Restraining Order, Appointment of a Temporary Receiver, Expedited Discovery, an Order to Show Cause Regarding a Preliminary Injunction, and Other Equitable Relief* (the *"Statutory Restraining Order" or "SRO"*).[1]

---

[1] The Receiver requests the Court to take judicial notice of the pleadings on file in this lawsuit.

1

The *SRO* directs the Receiver to submit an initial report and periodic reports thereafter to the Court.  More specifically, the *SRO* states:

> "IT IS FURTHER ORDERED that the Temporary Receiver....within sixty (60) days of being appointed and periodically thereafter, as directed by the Court, file with the Court and serve on the parties a report summarizing efforts to marshal and collect assets, administer the receivership estate, and otherwise perform the duties mandated by this Order."

*SRO*, § VI, ¶ E.

On September 6, 2013, the Receiver filed his Initial Status Report [Docket No. 39] based upon the period from the inception of the receivership on July 10, 2013 through September 6, 2013.  This Second Status Report incorporates the information contained in the Initial Status Report, and is based upon information obtained through December 31, 2013.

## I.

## SUMMARY OF THE OPERATIONS OF THE RECEIVER AND DESCRIPTION OF KNOWN RECEIVERSHIP PROPERTY AND CLAIMS HELD BY THE RECEIVERSHIP ESTATE

Since the filing of his Initial Status Report, the Receiver continued to identify assets subject to the receivership, continued to liquidate receivership assets, investigated and developed claims held by the Receivership Estate, and settled numerous claims for the benefit of the Receivership Estate.

On October 16, 2013, the Receiver and his counsel interviewed Defendant Kevin White at the office of Mr. White's counsel.  Mr. White cooperated in the interview and the information Mr. White shared with the Receiver helped the Receiver identify additional assets to recover and assisted in the investigation of claims against third parties.

2

## A. IDENTIFICATION OF ADDITIONAL RECEIVERSHIP PROPERTY

Based on the Receiver's interview with Mr. White, the Receiver discovered that a display booth purchased with investor funds was being stored with the manufacturer of the booth in Carrollton, Texas. Through the forensic accounting conducted by the Receiver's accounting firm, the Receiver traced at least $40,000 of investor funds to The Trade Group, a company in Carrollton, Texas that manufactures display booths for promotional events. Defendant White had a display booth custom built to promote the Revelation Forex Fund and paid The Trade Group $40,000 for the booth. After the booth was used by Defendant White, it was returned to The Trade Group for storage. The Receiver confirmed the display booth was at The Trade Group and the Receiver negotiated the sale of the display booth to an independent third party for $6,000. From these sales proceeds, the Receiver paid The Trade Group $1,380 for the cost of storing the display booth for several months.

## B. SETTLEMENT OF FRAUDULENT TRANSFER CLAIMS

The Receiver determined that he had fraudulent conveyance claims against the family members of Defendant Kevin White, and those persons who worked in the KGW Capital office with Defendant White. The Receiver made demand upon them and they denied any liability to the receivership. The Receiver successfully negotiated settlements with each of the persons the Receiver alleged were recipients of fraudulent transfers, and such settlements were approved by the Court.

With respect to the White family, the Receiver recovered from the daughter of Defendant Kevin White approximately $7,000 from monies remaining in an account in the daughter's name; a 2009 Chevrolet Tahoe being driven by the daughter; and a Sig Sauer hand gun given by Defendant White to his daughter. The Receiver recovered from the son of Defendant White a

3

negligible sum ($13.00) remaining in a bank account in the son's name; and a shot gun given by Defendant White to his son. A 2010 Toyota Tundra being driven by White's son had no equity and was repossessed by the lender. The Receiver also obtained a release from Defendant White's ex-wife of her claims against the receivership estate arising out of her divorce decree.

The Receiver also negotiated settlements with each of the persons who worked with Defendant White in the KGW Capital Office, as follows:

Steve McCraw is paying $71,000 over the next several months[2];

Cody Savage paid $42,100;

Christine Xu paid $10,000; and

Jill Waterston paid $2,500.

The settlement of these claims totaling $125,600, without the expense of protracted litigation, will benefit the Receivership Estate and ultimately the approved claimants who are the beneficiaries of the Receivership Estate.

## C. CONTINUED LIQUIDATION OF RECEIVERSHIP ASSETS

In the months of October, November, and December, 2013, the Receiver sold the following receivership assets:

1. Sculpture of horses for $770

2. Trade Display (as discussed above) for $6,000

3. Guns for $2,600

4. 2009 Chevrolet Tahoe for $25,000

5. Miscellaneous personal property left over from the auction and fishing lures for $166.

6.

---

[2] To date Mr. McCraw has paid $40,000.

The Receiver is still seeking buyers for the following receivership assets:

1.  2008 Mercedes Benz S550 for sale for $32,000

2.  2002 Rolex Yacht Master watch for sale for $6,000

3.  One shotgun and one Sig Sauer handgun, which the Receiver is seeking to sell for approximately $700.

## D.  DEVELOPMENT OF CLAIMS HELD BY RECEIVERSHIP ESTATE

The Receiver continued investigating the role of other persons and entities, including professionals, involved with KGW Capital, the Revelation Forex Fund, the solicitation of investors in the fund, and/or the trading of the fund.  The Receiver made demand upon Weaver & Tidwell and the individual accountants who prepared the performance report of the account managed by Brian Hinman that was used by Defendant White.  In addition, the Receiver made demand upon Sean Hyman whom the Receiver contends endorsed the Revelation Forex Fund for a period of time.

In furtherance of the Receiver's investigation, on November 20, 2013 the Receiver's counsel took the deposition of Brian Hinman, the person who traded the Revelation Forex Fund and who was employed by FXCM.  At the deposition Mr. Hinman invoked his 5th amendment privilege in response to most of the questions.  On December 30, 2013 the Receiver and his counsel met in Chicago, Illinois with James Bibbings, a former auditor for the National Futures Association, to determine the standards of the industry that should have been followed by FXCM in dealing with Defendant White, KGW Capital, and the Revelation Forex Fund.  The Receiver recently made demand upon FXCM for the production of additional documents.

The Receiver also made demand upon Doug Conder (the CPA who prepared the K-1's issued to the investors) to pay to the receivership a sum equal to the cost to amend the tax returns, and reissue the K-1's

The Receiver received assignments of the claims against third parties from each of the investors in the Revelation Forex Fund. The Receiver proposed to the Court as part of the Receiver's liquidation plan that these claims against third parties be pursued on a reduced contingent fee basis.

## II.

## AMOUNT OF CASH ON HAND AND ACCRUED ADMINISTRATIVE EXPENSES

To administer the receipt and disposition of monies in the receivership, the Receiver opened receivership accounts at JP Morgan Chase and at Legacy Bank.  The current balance of the Legacy Bank Account is $28,535.91.  Legacy Bank originally claimed a right of offset to these monies based upon a loan Legacy Bank had made to a receivership entity that is in default, but Legacy Bank, despite having actual notice of the need to file a creditor claim in the receivership, failed to file a claim in the receivership and does not hold an approved claim in the receivership.  Accordingly, the Receiver contends such monies are available to the receivership. The current balance held in the receivership account at Chase is $3,256,526.16.  The Receiver also has $40 cash on hand received from the sale of fishing lures that remains to be deposited into the receivership account.

The accrued and unpaid administrative expenses from the inception of the receivership through December 25, 2013 that have not been paid are approximately as follows:  $37,965 in Receiver's fees; $65,705.50 in Receiver's attorney's fees; $10,761.43 in expenses incurred; and $5,509.10 in Receiver's accounting fees and expenses.  In addition, a check payable to Platinum

Storage in the amount of $147 has not yet cleared the bank.  As a result, the current balance of unencumbered funds in the receivership account at Chase is approximately $3,136,438.10[3].  A schedule of the Receiver's receipts and disbursements from the inception of the receivership through January 3, 2014 is attached hereto as **Exhibit A.**

## III.

## THE STATUS OF CLAIMS PROCEEDINGS FOR INVESTORS AND CREDITORS

On October 9, 2013, the Receiver filed with the Court the Receiver's Proposed Liquidation and Distribution Plan and established a procedure for investors and creditors to submit claims to the Receiver; for the Receiver to make his recommendations regarding the claims; and an opportunity for the investors and creditors to object to the Receiver's recommendations.

On October 30, 2013, the Receiver filed his Report Regarding the Responses of Investors and Creditors to the Receiver's Proposed Liquidation and Distribution Plan.  This Report included a list of the claims filed by the investors and creditors as well as the Receiver's recommendations regarding the claims.  As set forth in the Receiver's Report, no investors or creditors objected to the Receiver's Proposed Liquidation Plan.  One creditor, First Community Bank, objected to the Receiver's Distribution Plan, which proposes to pay investors before paying creditors.  First Community Bank objected to the Receiver's proposal and argues that creditors should be paid ahead of investors, or equally.  No other objections were filed by any investor or creditor.

On November 6, 2013, the Receiver filed a motion with the Court requesting a hearing on the Receiver's Liquidation and Distribution Plan.  The Court granted that motion and conducted

---

[3] This balance is based upon the cash on hand as of January 3, 2014, and administrative expenses incurred as of December 25, 2013.

7

a hearing on December 5, 2013. To date the Court has not ruled upon the objection or the proposed Liquidation and Distribution Plan. Once the Court issues its ruling the Receiver intends to request the Court to authorize the Receiver to make an interim distribution to the approved claimants.

IV.

<u>RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP</u>

This is the second report from the Receiver and significant work remains for the Receiver to do in this case, including selling the few remaining assets, recovering damages from third parties as discussed herein, administering the investor and creditor claims, and making distributions pursuant to a distribution plan to be approved by the Court. Accordingly, the Receiver recommends the receivership continue.

Respectfully submitted January 6, 2014.

**RECEIVER KELLY M. CRAWFORD**

*/s/ Kelly M. Crawford*
Kelly M. Crawford, Receiver
State Bar No. 05030700
500 North Akard Street, Suite 2700
Dallas, Texas 75201
(214) 706-4200 – Telephone
(214) 706-4242 – Telecopier

8

9

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 6, 2014 I electronically filed the foregoing document with the clerk of the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record:

Harry E. Wedewer
John Einstman
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
*Counsel for Plaintiff*

Edwin Tomko
Jason Ross
Dykema Gossett, PLLC
1717 Main St., Suite 4000
Dallas, TX 75201
*Counsel for RFF GP, LLC, KGW Capital Management, Kevin G. White, Revelation Forex Fund, LP, and W Corporate Real Estate, LP d/b/a KGW Real Estate*

Meridian Propane LP
5645 Hillsborough Drive
Plano, Texas 75093
*Relief Defendant*

*/s/  Kelly M. Crawford*
KELLY M. CRAWFORD

9